[No. S016718. July 16, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN DAVID CATLIN, Defendant and Appellant.

98

COUNSEL

Horace N. Freedman and Jeffrey Schwartz, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Ward A. Campbell, Shirley A. Nelson and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GEORGE, C. J.—On December 23, 1985, in an information filed in Kern County, defendant was charged with the 1976 murder of Joyce Catlin, his fourth wife (Pen. Code, § 187)[1] and the 1984 murder of Martha Catlin, his mother. (§ 187.) It was alleged that the murder of Martha Catlin was committed for financial gain (§ 190.2, subd. (a)(1)), that the murder was intentionally committed by the administration of poison (§ 190.2, subd. (a)(19)), and that defendant was convicted of more than one offense of murder in the present proceeding (§ 190.2, subd. (a)(3)). The information originally included a torture-murder allegation, which later was dismissed. On September 7, 1988, the information was amended to include an allegation that defendant previously had been convicted of the 1984 first degree murder of Glenna Kaye Catlin, his fifth wife. (§ 190.2, subd. (a)(2).)

On June 1, 1990, the jury returned a guilty verdict on both murder counts and found true the murder for financial gain, murder by poison, and multiple murder allegations. Thereafter defendant admitted the truth of the prior-murder-conviction special-circumstance allegation.

On June 6, 1990, the jury fixed the penalty at death. This appeal is automatic. (§§ 190.4, 1239, subd. (b).)

---

[1]Statutory references are to the Penal Code, unless otherwise indicated.

# I. FACTS

## A. *Guilt phase evidence*

### 1. *The murder of Joyce Catlin*

Joyce Catlin, defendant's fourth wife, died in Bakersfield on May 6, 1976. She had developed what appeared to be flu-like symptoms about three weeks before her death and, upon consulting a physician, was admitted to a hospital. Before admission, she complained of back pain, vomiting, and a sore throat. She was transferred to the hospital's intensive care unit the day after her admission. Her lungs appeared to be affected. Dr. Einstein, a lung specialist, treated her without success for possible viral or bacterial infection. She did not respond to various antibiotic medications. Her lungs failed to oxygenate her body sufficiently, and she required mechanical ventilation. Nineteen days after admission to the hospital, her lungs failed entirely and she died.

An autopsy disclosed gross pulmonary fibrosis. Pathologist Dr. Bruce Swinyer, who performed the autopsy, testified that Joyce's lungs were extremely heavy and fibrotic and that there was no indication of viral or bacterial infection that could have caused death. The death certificate listed the cause of death as acute respiratory failure due to unknown microorganisms, but attending physicians suspected poisoning by paraquat, a highly toxic poison used in agriculture to control weeds. (Although several witnesses referred generally during the course of the proceedings to paraquat as a pesticide, technically it is an herbicide.)

Dr. Einstein testified that the cause of death was pulmonary fibrosis. In this condition, the lungs develop massive scarring and are unable to function to exchange oxygen and carbon dioxide. He could not identify any natural cause of this condition. He testified that in 1976, toxicological tests that could disclose the presence of paraquat more than 72 hours after administration did not exist. Tissue collected during the autopsy was preserved in formalin, which precluded later testing for the presence of paraquat. At trial, Dr. Einstein stated his opinion that Joyce died of paraquat poisoning, based in part on the opinion of Dr. Kilburn, a lung pathologist, and in part on the absence of any natural agent that could have caused her death. He also relied upon the clinical course of Joyce's symptoms and the appearance of her lungs after death.

Dr. Kilburn, a professor of medicine and expert in lung pathology, examined tissue samples sent to him in 1976 by Dr. Swinyer. He testified that

Joyce's lung tissue almost was destroyed by fibrosis, that the fibrosis was caused by a chemical, and that the only chemical that could produce such fibrosis was paraquat. He explained that it could take up to 30 days or as little as 12 hours for paraquat to cause death, depending upon the dose. When he showed the slides to a visiting professor who was an expert in paraquat poisoning, the latter said that they constituted a perfect example of paraquat poisoning.

Dr. Ford, a clinical toxicologist employed by the Chevron Environmental Health Center, explained that paraquat poisoning progressed in typical stages. Initially, the patient experiences a burning sensation in the mouth, and then after about 12 hours develops symptoms such as nausea, vomiting, and diarrhea. These symptoms may persist for a few days, but by the seventh day after ingestion the patient may feel somewhat better. Some kidney impairment may follow, but normally is resolved after 14 days. The lungs become affected about a week after ingestion, and by the third week they typically are so fibrotic that they cannot function. He noted that consistent with these typical stages, Joyce experienced vomiting and other gastrological symptoms for about seven days, then developed some kidney dysfunction. As that resolved, she complained of shortness of breath, and X-rays disclosed some marking of the lungs and edema. Her lungs continued to deteriorate, and the autopsy disclosed a fibrotic condition typical of paraquat poisoning.

Dr. Stephens, then the Chief Medical Examiner of the City and County of San Francisco, reviewed Joyce's medical records and slides of her tissues. He also found the course of Joyce's symptoms consistent with paraquat poisoning, and testified that he believed she died of such poisoning.

In sum, these medical and toxicological experts gave their opinions at trial that the cause of Joyce's death was paraquat poisoning, relying in large part upon her distinctive clinical symptoms and upon tissue analysis.

The prosecution did not introduce direct evidence regarding the manner in which paraquat was administered to Joyce. There was evidence that shortly before she became ill, Joyce and defendant attended a party where she showed signs of intoxication, and that shortly thereafter she developed severe gastric symptoms, including violent vomiting. There also was evidence that shortly after her hospitalization, defendant supplied Joyce with a milkshake.

The following evidence related to defendant's potential motive for killing Joyce. Joyce had credit life insurance, which was used to pay off a $6,741 debt on an automobile, as well as an insurance policy paying up to $2,000

and a $5,000 life insurance policy, the benefits of which were paid to defendant. When Joyce was in the hospital, defendant said to her sister that he thought the credit life insurance covered both the couple's house and their automobile. There also was evidence that defendant had engaged in extramarital affairs while married to Joyce, and that the couple had argued over a girlfriend of his.

Edith Ballew, who had been defendant's third wife, testified that she and others suspected shortly after Joyce's death that defendant was responsible for it.

There was evidence that access to paraquat was controlled under state law, but that defendant had access to it in 1976 and 1977 when he worked as a mechanic for a large agricultural enterprise. Several witnesses recounted defendant's statements—some statements from 20 years before trial—indicating his belief that paraquat was an effective herbicide that was extremely dangerous to human beings, that he was aware of the effect of paraquat on the lungs, that he possessed agricultural poisons he had acquired at work, and that he had shown the father of his second wife a container of a poison he said would kill anything or anybody, a poison that he believed to be ideal for use in a murder because it could not be detected and because there was no antidote. In 1975, defendant cautioned Joyce's son not to enter his garage, which contained dangerous agricultural poisons, and warned the boy regarding the danger of contact with paraquat.

### 2. The murder of Martha Catlin

Martha Catlin, defendant's 79-year-old mother, died in Bakersfield on December 8, 1984, after an illness lasting two or three days.

In 1982, Martha had a mild stroke. At that time, Edith Ballew contacted Martha's physician, Dr. Sproule, and suggested that Martha had been poisoned with paraquat. Dr. Sproule reported finding no sign of poisoning.

In September 1984, Martha again visited Dr. Sproule. She had not been taking her medication for hypertension, and her blood pressure was high. When she returned to the physician on October 31, 1984, she complained of poor memory and reported poor eating habits. Against medical advice, she had been drinking wine. Dr. Sproule prescribed a cough syrup with codeine at that time.

Edith Ballew visited Martha on Thursday, November 29, 1984, when Martha appeared in her usual state of health. On Thursday, December 6,

1984, however, Martha telephoned her friend Anna Stonebraker to request assistance because of a serious illness. Mrs. Stonebraker testified that Martha appeared very ill, exhibiting swollen purple lips and mouth as well as dark circles under her eyes. When Martha presented herself at Dr. Sproule's office, she had a reddish purple tongue and throat and had a temperature of 102 degrees. Dr. Sproule treated her with penicillin and asked her to return the next day. Mrs. Stonebraker was unable to care for Martha and left a message for defendant, asking his assistance, but he called back later and stated he was unable to come from his home in Fresno to Bakersfield, where Martha lived. Defendant telephoned Dr. Sproule the next day and stated that he would send someone to stay with his mother.

Mrs. Stonebraker took Martha back to Dr. Sproule on Friday, December 7, 1984. At that time Martha's throat was still sore and purplish, and she had difficulty eating. The next day at 5:30 a.m., Dr. Sproule received a call reporting that Martha appeared to be dead. He sent an ambulance, and Martha was pronounced dead on her arrival at the hospital.

Edith Ballew learned of Martha's death on Sunday, December 9, 1984, and called at Martha's home. She found defendant there, and he stated that he had been to visit that week, heard that his mother had the flu, and sent a woman to come stay with her.

An autopsy was performed, and tissue samples from Martha's lungs and kidneys were sent to a Chevron laboratory in Richmond. The toxicological report concluded that Martha had ingested a significant amount of paraquat. Dr. Ford, the clinical toxicologist whose testimony with regard to Joyce Catlin's death is described above, explained that until two or three years before trial, Chevron had been the sole distributor of paraquat in the United States. He stated it was probable that Martha had ingested diluted paraquat six or seven days before her death. Dr. Dollinger, the pathologist who performed the autopsy, concluded after receiving the toxicological report that the cause of death was paraquat poisoning.

Dr. Kilburn testified that Martha had lung damage consistent with paraquat poisoning. Dr. Kilburn reported that Martha was killed by the ingestion of paraquat, probably three to six days before her death, but that due to her frail condition, she died before the paraquat rendered her lungs highly fibrotic.

Dr. Stephens testified that, although it was possible Martha died of a heart attack, he believed her death was caused by paraquat poisoning. She had early signs of paraquat poisoning and had sufficient paraquat in her system to cause death.

In sum, toxicological evidence and clinical symptoms led prosecution medical and toxicological experts to state that their opinion beyond a reasonable doubt was that Martha had died of paraquat poisoning.

Defendant had made statements indicating a concern that his mother planned to alter her will to make the African Violet Society rather than defendant her primary beneficiary. Although defendant faithfully had visited and cared for his mother in her later years, and planned to have her move from Bakersfield to Fresno to be closer to him, he had made statements indicating that he was tired of caring for her and wished she "would hurry up and die." In addition, there was evidence that Martha disapproved of his many divorces and remarriages. Cash withdrawn by defendant and Martha from Martha's bank account in November 1984 and intended as a down payment on a new home for her had not been used for that purpose, and apparently remained in defendant's possession. Defendant was the sole beneficiary of Martha's will.

Defendant was a weekly or biweekly visitor to Martha at the time of her death. Initially, the prosecution presented testimony of defendant's employee that defendant had been absent from work during most of the week preceding Martha's death, but the witness later concluded that he had been mistaken. The witness then reported that defendant, who lived in Fresno, left for Bakersfield either Thursday December 6, or Friday, December 7, 1984. Defendant had visited his mother on Sunday, December 2, 1984.

After defendant's arrest for the murder of his mother, a bottle of paraquat dated April 1977 was discovered in a garage or workshop used by defendant and his former father-in-law in their independent auto-related businesses. The cap of this bottle bore defendant's fingerprint.

A jailhouse informant testified that defendant solicited his assistance in intimidating Edith Ballew, defendant's third wife, who persistently had urged the authorities to investigate the charged crimes and to prosecute defendant for murder. The informant also recounted that defendant had stated: "I killed the bitches."

3. *Uncharged crime*

In addition to the evidence recounted above, a large volume of uncharged crime evidence was introduced indicating that defendant had murdered his fifth wife, Glenna Kaye Catlin, by administering paraquat. She died on March 14, 1984, after 22 days of hospitalization. Overwhelming evidence from clinical records and toxicological reports from tissue samples demonstrated that she had died of paraquat poisoning. There was evidence of a

public argument between Glenna and defendant a few days before she began exhibiting symptoms, as well as evidence that defendant had considered their marriage to be one of convenience, that he had been unfaithful, and that Glenna had become jealous. He received $56,785 in life insurance proceeds following her death, and there was evidence that he had displayed grief at her funeral but immediately thereafter had exhibited high spirits. There was also evidence establishing that in 1977, defendant had warned Glenna's half brother regarding the dangers of paraquat, noting in particular that it would damage the lungs.

Evidence that defendant previously had been convicted at a separate trial of the murder of Glenna was not introduced until after the jury in the present case returned its verdict on the murder charges and the special circumstance allegations other than the one alleging the prior conviction for the murder of Glenna. At that point, defendant stipulated to the prior-murder-conviction special-circumstance allegation.

### 4. *Defense case*

Defendant testified at length in his own behalf, denying that he had poisoned any of the victims.[2] He denied making statements indicating his belief that paraquat would be an ideal poison for a murder. He denied knowingly possessing paraquat and, through his own testimony and the testimony of others, demonstrated that the area in the garage or workshop in which the paraquat was found was an area devoted to his father-in-law's automotive business. It was established that persons other than defendant and his father-in-law also had access to this garage.

Defendant's roommate testified that defendant had returned to his Fresno home around 8:00 or 9:00 p.m. on December 6, 1984, the night Mrs. Stonebraker telephoned to report Martha's illness. There was evidence that defendant had been in Fresno conducting business on December 3, 4, 6, and 7, 1984.

In addition, defense evidence demonstrated that defendant's home and place of business had been subjected to a thorough police search at the time of defendant's arrest and that no paraquat bottle had been discovered. The defense also presented evidence indicating that defendant's father-in-law (Glenna's father) had searched their joint workplace without finding the bottle of paraquat, but that when the police asked him to search again, he invited two boys to help him and found the bottle within a few minutes. Defendant also attempted to establish through the testimony of an expert

---

[2]Defendant's credibility was impeached with a 1966 forgery conviction.

witness that a fingerprint could have been planted on the bottle of paraquat, and pointed out the lax procedures under which the bottle had been transported to the police station and stored pending testing. A person employed at the agricultural enterprise where defendant had been employed testified that defendant had worked there only as a mechanic, and the circumstances of his employment would have made it unlikely he could have obtained paraquat on the job.

Defendant also pointed to evidence suggesting that his third wife, Edith Ballew, had been engaged in a vendetta against him, having urged the authorities to investigate each death involved in the present case as a murder. He presented witnesses who testified that he appeared to have a flourishing business and did not appear to be in need of funds.

Friends of defendant's recalled that shortly before Joyce's hospitalization, defendant had learned, upon his return from a trip to Mexico, that Joyce had fallen ill.

Dr. Bayer, a toxicologist who had some experience with paraquat poisoning, testified that he could not determine beyond a reasonable doubt that Joyce had died from paraquat poisoning. He was of the opinion that her death might be attributable to an unknown virus.

Dr. Buteau, a Chevron toxicologist, testified that Martha's medical records reflected she may have ingested as little as a tablespoon of paraquat (still a fatal dose in his opinion) and that she may have ingested it between two and seven days before her death. Dr. Russell, a pathologist at the University of California, Davis Medical School, testified that although Joyce's lung damage was consistent with paraquat poisoning, it was also possible that it was caused by agents other than paraquat. Dr. Buteau had a reasonable doubt as to the cause of Joyce's death.

Carol Johnson, a woman who had been dating defendant at the time of Martha's death (and later married and divorced him), testified that she and defendant had visited Martha on Sunday, December 2, when she and defendant brought Martha a new television set. Martha complained that she had a sore throat, her ears were bothering her, and she was taking medication for flu-like symptoms. Johnson testified that defendant was not alone with his mother that day.

After considering the evidence, the jury found defendant guilty of the first degree murders of Joyce and Martha, and found true the murder for financial

gain, murder by poison, and multiple-murder special-circumstance allegations submitted to it as to the murder of Martha. As previously noted, after the jury returned its verdict, defendant stipulated to the truth of the special circumstance allegation that he previously had been convicted of the first degree murder of Glenna.

B. *Penalty phase evidence*

At the penalty phase of the trial, the prosecution introduced evidence establishing that in 1966, defendant assaulted his first wife in a fit of jealousy, choking her and throwing her out of the automobile in which they were travelling. Later defendant picked her up, went to obtain aspirin, and returned home.

Defendant presented the testimony of a number of members of a family he befriended who described his loyalty and helpfulness as a friend. A witness testified that defendant had saved her son's life. Defendant also presented evidence of his exceptionally positive adjustment in prison. Dr. Haney, a professor of psychology at the University of California, Santa Cruz, testified regarding the security precautions and the circumstances of confinement facing prisoners serving life sentences, and stated that such prisoners usually are compliant inmates. His review of defendant's prison record caused him to predict a smooth adjustment to such confinement. Kenneth Howard, a sergeant at the state prison where defendant was incarcerated after his conviction for the murder of Glenna, testified regarding the circumstances of confinement and reported that defendant was a model prisoner. Two supervisors at the prison testified regarding defendant's excellent work habits and positive effect on other inmates.

At the conclusion of the penalty phase, the jury returned a verdict of death.

## II. Discussion

A. *Guilt phase issues*

1. *Motion to dismiss for delay in prosecution*

Defendant contends that the trial court erred in denying his motion to dismiss count one, charging him with the murder of Joyce. He claims that the court should have granted his motion because of the nine-year delay between the murder of Joyce and the date he was charged with the crime, and he contends the failure to dismiss constituted a denial of due process of law.

■ Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay. (*Scherling v. Superior Court* (1978) 22 Cal.3d 493, 504-507 [149 Cal.Rptr. 597, 585 P.2d 219]; see also *People v. Morris* (1988) 46 Cal.3d 1, 37 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527]; *People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 910-912 [55 Cal.Rptr.2d 404].) A claim based upon the federal Constitution also requires a showing that the delay was undertaken to gain a tactical advantage over the defendant. (See *United States v. Lovasco* (1977) 431 U.S. 783, 795 [97 S.Ct. 2044, 2051, 52 L.Ed.2d 752]; see also *People v. Frazer* (1999) 21 Cal.4th 737, 774 [88 Cal.Rptr.2d 312, 982 P.2d 180].) We have observed that "[p]rejudice may be shown by loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay." (*People v. Morris, supra,* 46 Cal.3d at p. 37.)

■ In support of his motion, defendant offered the testimony of several witnesses. Joyce's treating physician, Dr. Einstein, testified that at the time of her illness he suspected paraquat poisoning and requested an autopsy. He believed he had conveyed his suspicion to the district attorney's office, but he did not form an educated conclusion that she died of paraquat poisoning until the mid-1980's. Joseph Johnson, who in 1976 was chief investigator for the Kern County District Attorney's Office, confirmed that in 1976 defendant's third wife, Edith Ballew, had contacted the office and accused defendant of murdering Joyce. Johnson assigned investigator Skinner to look into the accusation, although he did not have any admissible evidence of paraquat poisoning. In 1978 or 1979, a sergeant in the Kern County Sheriff's Department received a similar communication from another of defendant's ex-wives, but found that his office had no record of an investigation against defendant. He contacted the district attorney's office regarding the matter. An investigator at the Kern County Sheriff's Department also received a communication from Edith Ballew accusing defendant of murdering Joyce by the administration of paraquat, but the office took no further action beyond conveying the information to the Bakersfield Police Department.

Defendant also called as a witness John Armendariz, who had been an investigator for the Kern County Coroner's Office until 1978. While he was so employed, Edith Ballew related her suspicions to him and he examined

the coroner's records regarding Joyce's death. Dr. Ambrosecchia, also of the coroner's office, instructed him regarding the symptoms of paraquat poisoning, and Armendariz decided to send slides prepared at the time of the autopsy to the Bethesda Naval Hospital in Maryland for forensic examination. Dr. Ambrosecchia did not suggest he had any information about the case and, in fact, the autopsy had not been performed by the coroner's office but by staff at Mercy Hospital. At the end of 1977, Armendariz received a letter from the Bethesda laboratory stating that the slides were consistent with paraquat poisoning, but that because they had been prepared incorrectly in an inappropriate preservative, the laboratory could not test for paraquat.

In opposition to the motion, the prosecutor offered the testimony of Dr. Bruschi, who admitted Joyce Catlin to the hospital in 1976. The witness declared that at the time of her death he suspected paraquat poisoning but had no proof, particularly because he was informed at the time that no existing laboratory tests on autopsy tissue could disclose paraquat poisoning. Ronald Smith, a forensic toxicologist for the Kern County Coroner's Office, testified that in 1977 a coroner's investigator presented him with a tissue specimen jar containing Joyce's tissue (brain, liver, lung, kidney, and spleen) and asked whether he could analyze the contents for paraquat. After investigation, he determined that there was no toxicological test that could disclose paraquat in the tissue, because the tissue had been preserved improperly. Joyce's tissue was kept in the office for a longer period than normally would be the case, and ultimately was destroyed when a new coroner took office. When Martha died, however, the coroner's office requested an autopsy, and tissue from Martha's body was properly preserved and was tested for paraquat.

Defendant contends the delay in charging him with the murder of Joyce caused him prejudice, in that two persons who had attended the autopsy performed on Joyce's body had died before the 1990 trial, namely Dr. Ambrosecchia and Primus Jones, who also was employed by the Kern County Coroner's Office. Defendant also complains of the loss of the letter from the Bethesda Naval Hospital stating that the slides of Joyce's tissue had some characteristics of paraquat poisoning but that no paraquat could be found because of the preservative used. He further complains that the jar of tissue samples referred to by Ronald Smith had been destroyed before he was arrested, that the Bakersfield Police Department records relating to Joyce's murder had been destroyed, and that some of the labels on the tissue blocks that were prepared after Joyce's autopsy had been lost. Finally, defendant contends he was prejudiced by his own loss of memory of the events of 1976 and by his inability to produce alibi witnesses to testify concerning his whereabouts when Joyce ingested paraquat or to testify regarding his lack of access to paraquat at the time.

Defendant's claims of prejudice are weak. The evidence indicates that Dr. Ambrosecchia did not perform the autopsy, and there is no evidence suggesting that Ambrosecchia or Primus Jones would have testified favorably for the defense. Various witnesses testified that Joyce's tissue could not be subjected to a chemical analysis for paraquat because it was preserved in formalin rather than frozen, and it appears that the missing letter from the Bethesda Naval Hospital was consistent with this view. The loss of the jar containing tissue samples was insignificant, because preservation in formalin made it impossible to test for paraquat. Defendant does not suggest how records of the police investigation of the crime would have been relevant to his defense. As for defendant's loss of memory and alibi witnesses, the details of defendant's whereabouts at the time Joyce ingested paraquat were not highly significant, given his unlimited access to the victim and the circumstance that the paraquat could have been administered at any point over a lengthy period.

Moreover, the delay in prosecution was justified. Because of limitations in forensic science and because of the manner in which Joyce's tissue had been preserved, it would have been extremely difficult or impossible to make out a case against defendant at or near the time of the murder. Even when foul play is suspected, when available medical evidence does not support the suspicion further investigation certainly is justified. (See *People v. Archerd* (1970) 3 Cal.3d 615, 641-642 [91 Cal.Rptr. 397, 477 P.2d 421].) ██ "Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. . . . Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused . . . . A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt." (*People v. Dunn-Gonzalez, supra,* 47 Cal.App.4th at pp. 914-915; see also *People v. Webb* (1993) 6 Cal.4th 494, 528 [24 Cal.Rptr.2d 779, 862 P.2d 779].) By the time defendant was charged, of course, additional evidence of his guilt had emerged—particularly his involvement in the paraquat poisoning of two more persons. (See *People v. Archerd, supra,* 3 Cal.3d at pp. 641-643 [developing medical and forensic techniques and defendant's additional murders justified the filing of charges 11 years after the commission of a murder].)

██ Contrary to defendant's claim, the justification for the delay far outweighed the weak showing of prejudice presented by defendant. We also observe that there was no evidence that the delay was undertaken in order to

gain an advantage over defendant, but instead the evidence suggested the delay was caused by the limits of existing laboratory tests, by a mistake in preserving Joyce's tissue in formalin, and by the early caution of medical experts as to whether to state an opinion on the cause of Joyce's death. The trial court did not err in denying the motion to dismiss for delay in prosecution.

## 2. *Severance of counts*

■ Defendant contends that the court abused its discretion in denying his motions to sever count one, charging him with the murder of Joyce, from count two, charging him with the murder of Martha. He contends the error constituted a denial of his constitutional right to due process of law and a fair trial.

Section 954 provides that "[a]n accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ." The offenses in the present case were of the same class, and accordingly joinder was permissible. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

■ As we have explained: " ' "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.] [¶] . . . Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' " (*People v. Bradford, supra,* 15 Cal.4th at p. 1315.) Significantly, if evidence on each of the joined crimes would have been admissible in a separate trial of the other crimes, such cross-admissibility " ' "ordinarily dispels any inference of prejudice . . . ." ' " (*Id.* at p. 1316.) We examine the record before the trial court at the time of its ruling to determine whether the court abused its discretion in denying the severance

motion. (*People v. Price* (1991) 1 Cal.4th 324, 388 [3 Cal.Rptr.2d 106, 821 P.2d 610].)[3]

■ In a separate trial for the murder of Joyce, evidence that defendant had murdered Martha by paraquat poisoning would have been cross-admissible pursuant to Evidence Code section 1101. ■ "Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. [Citation.] Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*People v. Kipp* (1998) 18 Cal.4th 349, 369 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) ■ In addition, "[t]o be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses." (*Ibid.*) The similarity, considering the degree of similarity and the number of common marks, should amount to a signature. (*Id.* at p. 370.)

In order to be relevant as a common design or plan, "evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) We have explained that "the common features must indicate the existence of a plan rather than a series of similar spontaneous acts," and that "evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the *same* design or plan he or she used in committing the uncharged acts." (*Id.* at p. 403, italics added.)

■ In the present case, each count bore a number of distinctive common marks. In each instance, the victim was a close female relative of the defendant—wife or mother. In each instance, the defendant stood to gain financially from the victim's death. In Martha's case, it was overwhelmingly

---

[3]New constitutional and statutory provisions adopted by Proposition 115, adopted in June 1990 (see Cal. Const., art. I, § 30, subd. (a); Pen. Code, § 954.1) were not in effect at the time of the ruling on the severance motion and are not considered here. (See *People v. Bradford, supra,* 15 Cal.4th at p. 1314, fn. 13.)

established that the victim had ingested paraquat before death. Strong expert opinion evidence based on observations regarding the clinical course of the illness and the appearance of tissue removed at the autopsy established that the cause of death for Joyce also was paraquat poisoning. Paraquat poisoning is rare, and its occurrence with respect to two close relatives of one person is unlikely to be a matter of chance or to be the result of a spontaneous impulse. When evidence of a third instance of the same type of poisoning is introduced, as it properly was in the present case, the inference regarding a common design or plan becomes very strong. (See *People v. Diaz* (1992) 3 Cal.4th 495, 561-562 [11 Cal.Rptr.2d 353, 834 P.2d 1171] [when defendant claimed that hospital patient victims died of natural causes or due to negligence of hospital personnel, evidence that in an uncharged crime another victim attended by defendant died of lidocaine poisoning was relevant and admissible under Evid. Code, § 1101, subd. (b), to refute defendant's claim as to the cause of death and to establish identity and modus operandi]; *People v. Ruiz* (1988) 44 Cal.3d 589, 605-606 [244 Cal.Rptr. 200, 749 P.2d 854] [the abrupt disappearance of one wife under suspicious circumstances indicating foul play would be admissible to show identity of the perpetrator of the murder of defendant's fifth wife, who disappeared under similar circumstances]; *People v. Archerd, supra,* 3 Cal.3d at pp. 621, 628 [evidence that defendant had killed relatives by insulin poisoning was admissible evidence of modus operandi and knowledge of the means used to prove that he murdered other relatives by insulin poisoning].) We believe that these circumstances "dispel any inference of prejudice" arising from the joinder of the two counts. Even if we consider defendant's other claims of prejudice, we observe that neither crime was more inflammatory than the other. Further, contrary to defendant's claim, it cannot be said that the evidence of defendant's guilt of the murder of Joyce was particularly weak, especially in light of the proper admission of the evidence of the murder of Glenna by the same common plan.

Defendant also claims prejudice on the ground that his right to an impartial jury was impaired because the joinder subjected the jury to voir dire on prospective jurors' attitudes concerning the death penalty. Defendant contends that at a separate trial on the noncapital count charging defendant with the murder of Joyce, the jury would not have been death qualified and persons opposed to the death penalty would not have been excluded. The exclusion from a jury of persons opposed to the death penalty, however, does not violate the state or federal constitutional right to an impartial jury. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1198 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Ashmus* (1991) 54 Cal.3d 932, 956-957 [2 Cal.Rptr.2d 112, 820 P.2d 214].) In a case in which defendants are tried jointly, a defendant charged with a noncapital crime does not have a right to severance

on the ground that his or her jury no longer will be impartial if exposed to the death qualification voir dire required by a codefendant's capital charges. (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 794 [7 Cal.Rptr.2d 152].) Under defendant's theory, a capital and a noncapital offense never could be joined—a proposition that certainly is not supported by our case law.

Defendant finally contends that joinder was prejudicial because having heard evidence of both crimes, the jury would believe "the only way to properly punish appellant for committing two murders (Joyce and Martha) was to find him guilty of Martha's murder and thereby assure the death penalty." We agree with respondent that the claim is speculative and is particularly unpersuasive because the matter of penalty was not under consideration at the time the guilty verdict was rendered. In addition, because the evidence would have been cross-admissible even in separate trials, severance would not have avoided the result surmised by defendant. We conclude that the trial court did not abuse its discretion in denying defendant's motion to sever the trial of counts one and two.

### 3. *Separate guilt and penalty phase juries*

Defendant contends that the trial court erred in denying his motion for separate guilt and penalty phase juries. He claims a violation of his federal constitutional rights to an impartial jury, to a fair trial, and to a reliable sentencing determination. Referring to the special circumstance allegation that he committed the murder of Martha after having previously been convicted of another murder (§ 190.2, subd. (a)(2)), defendant contends it is inherently unfair to have the same jury try the guilt and penalty phases of a capital case when one of the special circumstances is a prior murder allegation. He contends that although the jury did not learn of the prior-murder-conviction special-circumstance allegation until after it had rendered its verdict in the guilt phase, he was forced to voir dire the potential jurors on their attitude toward a prior murder conviction in order to secure an unbiased penalty phase jury. He claims that this circumstance prejudiced the guilt phase deliberations, because voir dire questions hinted that defendant had suffered a prior murder conviction. He also contends that trial of both phases by the same jury produced a penalty phase jury that, knowing now of the prior conviction, would be prejudiced by defendant's earlier denials regarding the murder of Glenna.

Defense counsel's motion for separate juries was denied without prejudice to renewal at the conclusion of the guilt phase. It does not appear from our examination of the record that the motion was renewed. Defendant claims, however, that the trial court totally failed to exercise its discretion with

respect to his motion, because it denied the motion for separate juries solely under the mistaken belief that the motion could be entertained only at the conclusion of the guilt phase.

It is true that the trial court erred in directing that the motion could be entertained only after the guilt phase verdict. (See *People v. Rowland* (1992) 4 Cal.4th 238, 268 [14 Cal.Rptr.2d 377, 841 P.2d 897].) The court apparently did not consider the merits of defendant's motion. We believe, however, that the error was harmless. As section 190.4, subdivision (c), provides: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider . . . the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record . . . ."

■ As we have explained, there is a " 'long-standing legislative preference for a single jury to determine both guilt and penalty.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 483 [48 Cal.Rptr.2d 525, 907 P.2d 373].) "[T]he 'mere desire' of defense counsel 'to voir dire in one way for the guilt phase and a different way for the penalty phase,' " we have said, " 'does not constitute "good cause" for deviating from the clear legislative mandate . . . .' " (*People v. Rowland, supra,* 4 Cal.4th at p. 268 [counsel's desire to voir dire guilt and penalty phase jurors differently depending on whether or not they would be exposed to other evidence of defendant's other crimes did not require the empanelling of separate juries].) ■ We do not believe that defendant's concern regarding the asserted necessity for hypothetical voir dire questions regarding juror attitudes toward a prior murder conviction would establish as a " ' "demonstrable reality" ' " that members of the jury panel would be " ' "[unable] to perform the functions of a juror." ' " (*People v. Bradford, supra,* 15 Cal.4th at p. 1354.) Rather, defense counsel's concern was one that commonly may occur when defense strategy changes between the guilt and penalty phases of a capital trial.

We have observed, however, that "[i]n almost every capital trial, regardless of the special circumstances alleged, there will be evidence introduced at the penalty phase . . . which would otherwise be irrelevant or inadmissible in the determination of guilt. Defense counsel are routinely faced with difficult tactical decisions in having to fashion voir dire inquiries that probe for possible penalty phase biases regarding such evidence, while stopping short of revealing information otherwise prejudicial and excludable in the guilt phase. Certainly such will almost always be the case where the special circumstance alleged is a prior murder or murders. [Citation.] The mere desire to lessen or eliminate such tactical decisions in the voir dire of a

capital jury, without more, . . . does not constitute 'good cause' for deviating from the clear legislative mandate . . . that both the guilt and penalty phases of a capital trial be tried by the same jury." (*People v. Nicolaus* (1991) 54 Cal.3d 551, 573-574 [286 Cal.Rptr. 628, 817 P.2d 893].)

As respondent points out, if defendant's claim constituted good cause for separate juries, the policy of section 190.4, subdivision (c), would be circumvented in every case in which a prior-murder special circumstance was alleged. In any event, it seems clear that because of the other-crimes evidence deemed admissible in the present case, prudent counsel would voir dire prospective guilt phase jurors—even for a separate guilt phase jury—extensively on their attitudes toward the other-crimes evidence, so that an additional question about actual convictions would add little if any prejudice. Defendant, in fact, does not point to any specific voir dire question that might have informed jurors who served on defendant's jury that defendant previously had been convicted of the murder of Glenna. Finally, the jury was instructed prior to the penalty phase that statutory provisions required they not be informed of the prior murder conviction until after the guilt verdict, out of concern for the defendant's right to a fair trial, that neither defendant nor the prosecution had been permitted to disclose the evidence previously, and that this procedure was not to influence the verdict at the penalty phase.

Similarly, defendant's claim that at the penalty phase the jury might have blamed defendant, because at the guilt phase he denied having committed the murder of Glenna, is speculative and would not constitute good cause requiring separate guilt and penalty phase juries. (See *People v. Pride* (1992) 3 Cal.4th 195, 252 [10 Cal.Rptr.2d 636, 833 P.2d 643] [danger that the jury might blame the defense for failing to disclose prior violent crimes at the guilt phase does not require separate juries].) This danger constitutes a common problem arising out of inconsistent defense strategies at the guilt and penalty phases of trial, yet such inconsistencies do not, without more, constitute good cause for empanelling separate guilt and penalty phase juries. (See *People v. Bradford, supra*, 15 Cal.4th at pp. 1354-1355, and cases cited; *People v. Lucas, supra*, 12 Cal.4th at pp. 482-483; *People v. Pride, supra*, 3 Cal.4th at pp. 252-253; see also *People v. Ray* (1996) 13 Cal.4th 313, 357 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

We conclude that defendant was not prejudiced by the trial court's error in directing that the motion for separate juries could be entertained only after the guilt phase verdict, and that this error did not implicate his constitutional rights. (See *People v. Rowland, supra*, 4 Cal.4th at p. 269, fn. 7.)

4. *Wheeler claim*

Defendant contended at trial that the prosecutor exercised peremptory challenges against two prospective jurors based upon their race. He

moved for a mistrial, citing *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. The trial court determined that defendant had made a prima facie showing that the prosecutor had excused the prospective jurors on the basis of their race. The prosecutor explained: "[T]he People's reason for excluding Mr. [W.] is because of his statements regarding the death penalty. He says that he believes everyone should live. He says that God is the only one who has the right to take a life. His answer is that if everyone agreed to the death penalty, that he would abide by that, but my interpretation is that he is not a strong believer in the death penalty and that he would be very reluctant to impose that penalty in any type of case [¶] I didn't make a challenge for cause at that time because he did say in some cases he could do it." The prosecutor explained that his reasoning was the same with respect to the other prospective juror in question, R. He stated that she had doubts about imposing the death penalty, and that she stated she would be reluctant to impose it. He referred to her religious affiliation, stating that his experience was that members of the church "would lean away from imposing the death penalty." He urged that he was not excusing the two prospective jurors because they were African-American, and suggested that apart from their views on the death penalty, he did not view the prospective jurors as pro-defense.

The trial court stated that it was persuaded that the prosecutor had excused the jurors because of their attitude toward the death penalty, and not on the basis of racial bias. The court recalled that the prosecution nearly had succeeded in excusing one of the two jurors for cause because of her attitudes, and concluded that statements made by both jurors supported the exercise of peremptory challenges on the basis of their attitude toward the death penalty.

"In [*Wheeler*] . . . we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group member-ship violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in *Batson* v. *Kentucky* (1986) 476 U.S. 79, 84-89 [90 L.Ed.2d 69, 79-83, 106 S.Ct. 1712] . . . the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution. African-Americans are a cognizable group for purposes of both *Wheeler* [citation] and *Batson* [cita-tion]." (*People v. Alvarez* (1996) 14 Cal.4th 155, 192-193 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Whether a *Wheeler* or a *Batson* claim (*Batson v. Kentucky, supra*, 476 U.S. 79) is raised, "the defendant need not be a

member of the group in question in order to complain." (*People v. Alvarez, supra*, 14 Cal.4th at p. 193.)[4]

■■■ "This court established in *Wheeler, supra*, 22 Cal.3d 258, 'that peremptory challenges may not be used to remove prospective jurors solely on the basis of presumed group bias. We defined group bias as a presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic or similar grounds. [Citations.]' . . . [¶] A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing that one or more jurors has been excluded on the basis of group or racial identity. The high court has explained that the defendant is required to 'raise an inference' that the exclusion was based on group or race bias. [Citation.] Once a prima facie showing has been made, the prosecutor then must carry the burden of showing that he or she had genuine nondiscriminatory reasons for the challenges at issue." (*People v. Jenkins* (2000) 22 Cal.4th 900, 993 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) A prosecutor legitimately may exercise a peremptory challenge against a juror who is skeptical about imposing the death penalty. (*People v. Jones* (1997) 15 Cal.4th 119, 163, fn. 13 [61 Cal.Rptr.2d 386, 931 P.2d 960], disapproved on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn.1 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

■■■ Defendant contends that the prosecutor did not provide legitimate, nondiscriminatory reasons for excusing the jurors, and claims that the prosecutor believed improperly that because defendant is White, defendant had no basis upon which to object to the exclusion of African-American jurors. Defendant also claims that the prosecutor proffered other discriminatory reasons for excusing the jurors, namely that he excused them on the basis of their religion. He also contends that the trial court rejected his motion without adequate inquiry or reflection.

We have explained that "we review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges 'with great restraint.' " (*People v. Ervin* (2000) 22 Cal.4th 48, 74 [91 Cal.Rptr.2d 623, 990 P.2d 506].) The trial court's determination is a factual one, and as long as " ' "the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal" ' " when they are supported by substantial evidence. (*Id* at pp. 75, 76.)

---

[4]Respondent contends that defendant did not refer to *Batson* or equal protection principles at the time of trial, and that he thereby waived any claim based upon those principles. Because essentially the same standard applies under either *Wheeler* or *Batson* (see *People v. Alvarez, supra*, 14 Cal.4th at p. 193; *People v. Clair* (1992) 2 Cal.4th 629, 652 [7 Cal.Rptr.2d 564, 828 P.2d 705]), and because defendant fails to persuade us that his rights under the California Constitution were violated, the point is moot.

Prospective Juror R. stated that she was uncertain whether she could decide upon the penalty, observing that: "To tell you the truth, I'm so tenderhearted, I just feel sorry for people[] and it would be kind of hard for me to do." When asked how she felt about the death penalty, she stated: "If you want to know the truth by me, I hate to see anybody kill anybody. . . . [B]ut when it come[s] down to, you know, convicting somebody, I just really hate to do it." When asked whether, as a juror, she could impose either the death penalty or life imprisonment, she said "I don't think I could. I don't feel like I could." Regarding imposing the death penalty, she said: "I guess if I was on [a] jury and I had to I could go ahead and do it, but I would hate to do it." She repeated this reservation under questioning by defense counsel. She elaborated that she was tenderhearted and that the death penalty "is killing somebody," and that she would have compassion for defendant because she would imagine one of her own relatives in his position. Responding to questions by the prosecutor, she later stated that she would not join 11 other jurors in imposing the death penalty and that she truly did not believe she could vote for the death penalty in any case. She stated that she was religious and that she thought that imposing the death penalty violated the commandment "Thou shalt not kill." "My feeling and my religion don't agree for me to do things like that." The court overruled the prosecutor's challenge for cause, stating: "She said that she would, if the evidence was sufficiently strong, she could impose the death penalty, very obviously reluctant to do so, but I think this is more a factor to be considered in peremptory challenges. I think she could not be excused for cause . . . ." The juror's statements very clearly reflect serious reservations about the death penalty, a race-neutral ground upon which the prosecutor legitimately could exercise a peremptory challenge.

Prospective Juror W. stated that "I belong to what's called the Church of Christ. God, I believe, is the only person that has the right to take someone's life." He also stated that he believed in the commandment "Thou shalt not kill" and seemed to feel that the state should abide by that rule.

The record supports the conclusion that the trial court made a "sincere and reasoned effort" to evaluate the prosecutor's justifications, and substantial evidence supports its conclusion that the prosecutor had race-neutral reasons for excusing the two jurors. That the jurors were equivocal about their ability to impose the death penalty was relevant to a challenge for cause, but did not undercut the race-neutral basis for the prosecutor's decision to excuse the prospective jurors peremptorily. References to religion did not reflect bias against a particular religion or against religion in general, but rather a concern that the prospective jurors' religious beliefs would make them reluctant to impose the death penalty. This concern was a permissible ground

for the exercise of a peremptory challenge. (*People v. Ervin, supra,* 22 Cal.4th at p. 76.) The prosecutor's statements concerning defendant's ethnic group did not suggest that the prosecutor excused the jurors because of their race, but were offered as further proof that the prosecutor had not acted out of racial bias. Even assuming the prosecutor was confused on this point, the trial court's statements did not reflect that *it* doubted that a White defendant has standing to raise a Sixth Amendment challenge to the exercise of peremptory challenges against African-American jurors. Finally, the court's statements indicate that it carefully reviewed defendant's motion, and further inquiry or statements on the record were not required. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1282 [18 Cal.Rptr.2d 796, 850 P.2d 1].)[5]

Defendant contends that although the trial court determined that the prosecutor had proffered race-neutral reasons for excusing the two prospective jurors, the court failed to determine whether the prosecutor actually was motivated by these neutral reasons. (See *People v. Alvarez, supra,* 14 Cal.4th at pp. 197-198.) We believe that the statement of the trial court belies this claim. The court observed in denying defendant's motion: "However, the explanations offered by [the prosecutor] convince the Court that excusing Mr. [W.] and Mrs. [R.] *was not because of* their race but *was based on* permitted reasons for exercising peremptories, and that is their attitude toward the death penalty."

### 5. *Uncharged crime evidence*

Defendant contends the court erred in permitting the prosecution to introduce evidence regarding the murder of Glenna. As noted, defendant's prior *conviction* for this crime was not admitted until after the jury reached its guilty verdict (see § 190.1, subds. (a) & (b) [trial of a special circumstance allegation that the defendant has suffered a prior murder conviction shall be held only after the jury has reached a guilty verdict and made findings on any other special circumstance allegation]), but *evidence* regarding the murder of Glenna was admitted as evidence of an uncharged crime made admissible by Evidence Code section 1101. Defendant, however, contends that the murder of Glenna did not bear common marks with the charged murders of Joyce and Martha. He contends the evidence relating to Glenna was not material to the issue of identity and did not tend to establish a common scheme or plan.

---

[5]We reject, as we have in the past, defendant's contention that we should compare the responses of jurors who were excused with the responses of those who were not excused in analyzing whether the trial court's reasoned effort to evaluate the prosecutor's claims satisfied *Wheeler* and *Batson.* (*People v. Ervin, supra,* 22 Cal.4th at p. 76; *People v. Jones, supra,* 15 Cal.4th at p. 162.)

Before trial, the prosecutor moved to admit evidence that defendant had murdered Glenna by administering paraquat. The prosecutor contended this evidence tended to demonstrate that Martha and Joyce were poisoned by a criminal agency, that this criminal agency was paraquat, and that defendant was the person responsible for the murders. Defendant objected on the basis of Evidence Code section 1101, subdivision (b). The trial court announced that it would review the preliminary hearing transcript and the transcript of the hearing held on a motion pursuant to section 995. The following day, defense counsel urged that the evidence concerning Glenna was weak, did not establish beyond a reasonable doubt defendant's responsibility for her murder, had little probative value in the present trial, but would have considerable prejudicial impact. The court ruled that the evidence was probative and could be admitted.

We review the trial court's determination for an abuse of discretion, examining the evidence in the light most favorable to the court's ruling. (*People v. Kipp, supra*, 18 Cal.4th at pp. 369, 370.)

We have observed above that, despite the prohibition against admitting evidence of an uncharged crime to demonstrate a defendant's criminal propensity, such evidence is admissible to show identity or the existence of a common scheme or plan. (*People v. Kipp, supra*, 18 Cal.4th at p. 369.) This type of evidence, when offered on the issue of identity, "must be highly similar to the charged offenses." (*Ibid.*) Evidence tending to establish a common plan or design should demonstrate " 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*People v. Ewoldt, supra*, 7 Cal.4th at p. 402.)

In the present case, the charged and uncharged crimes bore a number of highly distinctive common marks. As we already have discussed in connection with defendant's severance claim, each victim was a close female relative of the defendant—wife or mother. In each instance, the defendant stood to gain financially from the victim's death. In the case of Glenna and Martha, it was overwhelmingly established that the victims had ingested paraquat before death. Expert opinion evidence based on observations regarding the clinical course of each woman's illness established that the cause of death for all three victims was paraquat poisoning. Such poisoning is rare and is unlikely to be the cause of death for three persons closely related to one individual. Rather, the occurrence of three similar poisonings of related persons supports inferences regarding identity and a common plan. (See *People v. Diaz, supra*, 3 Cal.4th at pp. 561-562 [multiple lidocaine poisonings]; *People v. Ruiz, supra*, 44 Cal.3d at pp. 605-606 [repeated disappearances of the wives of the defendant]; *People v. Archerd, supra*, 3 Cal.3d at

pp. 621, 638 [multiple insulin poisonings of relatives of defendant].) The murders of Glenna and Joyce bore other common marks—in each case the victim was the defendant's wife, each woman was healthy, then initially suffered flu-like symptoms, followed by respiratory collapse over a period of days. Evidence that defendant had poisoned one wife was relevant to establish that another apparently healthy wife had died through a criminal agency, namely poison. (See *People v. Ruiz, supra,* 44 Cal.3d at p. 606.)[6] The trial court did not abuse its discretion in determining that the evidence of the uncharged crime was relevant to identity and to show a common scheme or plan.

Defendant complains that evidence establishing that Glenna died by paraquat poisoning should not have been introduced to show that Joyce died of the same cause. He contends that toxicological evidence existed to demonstrate that paraquat was the cause of Glenna's death, but that there was no toxicological evidence supporting the opinions of the prosecution's expert witnesses who had concluded that Joyce died of paraquat poisoning. In fact, he complains, the expert opinion evidence pertaining to Joyce was based not solely upon clinical observations regarding the course of her illness but also in part upon the evidence demonstrating that Glenna and Martha had died by paraquat poisoning. He accuses the prosecution of *creating* the common marks between the killing of Glenna and Joyce, rather than relying upon existing features in common between the two killings.

As we have observed, the common marks between the murders of Glenna, Martha, and Joyce certainly were relevant to establish that all three died pursuant to a common design. It was not necessary that the prosecution be able to prove that Joyce died of paraquat poisoning by evidence entirely *independent* of the evidence relating to the murder of Glenna.[7] And, of course, the evidence relating to the uncharged murder of Glenna was not the only evidence tending to show the cause of Joyce's death. Evidence relating to the charge that defendant killed his mother Martha by paraquat poisoning had the same effect vis-à-vis the murder of Joyce. Strong expert opinion testimony based on clinical evidence and postmortem examination of tissue also supported the conclusion that Joyce died of paraquat poisoning.

---

[6]Defendant improperly refers to statements of the trial court in the Monterey County prosecution that led to his conviction for the murder of Glenna. We denied defendant's request to augment the record on appeal to include the transcript of the Monterey County trial, and that transcript is not part of the record on appeal in the present case.

[7]Defendant emphasizes that the information charging that he murdered Joyce did not include an allegation that the murder was committed by means of poison. We do not believe that this circumstance strengthens defendant's claim that the evidence pertaining to Glenna was not relevant to show identity or a common scheme or plan. As noted, the murder of Glenna was relevant to show a criminal agency in the death of Joyce, and to support an inference as to the identity of her murderer.

Defendant makes a related claim that the evidence of the uncharged crime was more prejudicial than probative. He contends the evidence that was related to Glenna was unduly prejudicial, because the jury necessarily would realize that defendant had suffered a prior conviction for murder.

 Evidence of an uncharged crime may be admitted only if its substantial probative value is not outweighed by a danger of undue prejudice, of confusion of the issues, or of misleading the jury. "On appeal, a trial court's resolution of these issues is reviewed for abuse of discretion. [Citation.] A court abuses its discretion when its ruling 'falls outside the bounds of reason.' " (*People v. Kipp, supra*, 18 Cal.4th at p. 371.)

 The jury was not informed that defendant had suffered a conviction for the murder of Glenna until after it had returned its guilty verdict. Clearly, evidence regarding the circumstances of the murder of Glenna was of substantial probative value. In ruling upon the motion to admit evidence of Glenna's murder, the trial court reasonably could conclude that the probative value of the evidence outweighed the risk that the jury might suspect that defendant had been convicted of the murder of Glenna, despite the procedural protection provided by section 190.1. As respondent claims, the prospect of undue prejudice arising from a suspicion regarding a prior conviction was speculative, because the prosecutor did not plan to offer evidence of the conviction until after the guilty verdict. When at trial, as defendant now complains, an expert witness undergoing defense cross-examination referred to his testimony in a "prior trial," defendant did not object or seek an admonition to the jury, and that prior testimony, of course, was not before the trial court when it ruled on the motion pursuant to Evidence Code section 1101.

Defendant claims that the trial court erred prejudicially in failing to place on the record the process by which it concluded that the probative value of the evidence outweighed its prejudicial impact, but such explanations are not required. (*People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].) In any event, it is clear that the court carefully considered lengthy transcripts, written motions, and the arguments of counsel in reaching its conclusion, taking the matter under submission for a day in order to complete its review.

Defendant's contention that the admission of the other-crimes evidence violated his state and federal constitutional right to a fair trial is waived because it was not raised below. (*People v. Carpenter* (1997) 15 Cal.4th 312,

385 [63 Cal.Rptr.2d 1, 935 P.2d 708].)[8] In addition, he does not provide authority establishing that a state law permitting the admission of evidence of uncharged crimes violates a defendant's right to a fair trial. Reference to two federal cases discussing due process limitations on the admission of *irrelevant* character or criminal propensity evidence is unpersuasive; in both instances, the federal court determined that the disputed evidence was not material to any legitimate issue. (See *Henry v. Estelle* (9th Cir. 1994) 33 F.3d 1037, 1042, revd. on another point in *Duncan v. Henry* (1995) 513 U.S. 364 [115 S.Ct. 887, 130 L.Ed.2d 865]; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1382-1385; see also *People v. Falsetta* (1999) 21 Cal.4th 903, 913-914 [89 Cal.Rptr.2d 847, 986 P.2d 182].) By contrast, we have determined that the disputed evidence in the present case was material to issues of identity and common scheme or plan and was admissible under Evidence Code section 1101.

6. *Evidence relating to the motive for the uncharged murder of Glenna*

▮▮▮ Defendant contends that evidence that he received life insurance proceeds after Glenna died should have been excluded under the collateral estoppel doctrine. He claims violations of the federal constitutional protection against being placed twice in jeopardy and of his federal constitutional right to a fair trial and a reliable verdict.

At trial, defendant made an in limine motion to exclude evidence regarding the payment defendant had received as the beneficiary of Glenna's life insurance policy. He contended the evidence should be excluded under the doctrine of collateral estoppel because, on motion of the defense pursuant to section 1118.1, the court entered a not true finding as to the special circumstance alleging murder for financial gain. In support, he offered one page from the clerk's transcript of that trial—a minute order indicating the granting of the section 1118.1 motion as to that special circumstance allegation. The trial court in the present case determined that although the trial court in the Monterey County trial had found the evidence presented in *that* trial insufficient to support a true finding that the murder of Glenna had been undertaken for financial gain, that ruling did not preclude the introduction of evidence relating to defendant's motive for killing Glenna in the separate trial for the murders of Joyce and Martha.

▮▮▮ Under the collateral estoppel doctrine, which is a component of the Fifth Amendment's double jeopardy clause (*People v. Santamaria* (1994)

---

[8]Defendant also claims perfunctorily that the admission of this evidence violated his right under the state and federal Constitutions to a reliable guilt and penalty determination. This claim, too, is waived and in any event is without merit. (See *People v. Jenkins, supra,* 22 Cal.4th at p. 1044.)

8 Cal.4th 903, 912, fn. 3 [35 Cal.Rptr.2d 624, 884 P.2d 81]), "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (*Ashe v. Swenson* (1970) 397 U.S. 436, 443 [90 S.Ct. 1189, 1194, 25 L.Ed.2d 469].) ■ In the present case, however, defendant was not on trial for the murder of Glenna, and the question whether defendant murdered her for financial gain within the meaning of section 190.2, subdivision (a)(1), was not an issue of ultimate fact to be determined in the present proceeding.

■ We observe that the collateral estoppel doctrine does not prohibit the admission of evidence that has been introduced in a trial resulting in an acquittal from being admitted for all purposes at a subsequent proceeding. As the United States Supreme Court declared in *Dowling v. United States* (1990) 493 U.S. 342, 348 [110 S.Ct. 668, 672, 107 L.Ed.2d 708], the doctrine does not "exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible . . . simply because it relates to alleged criminal conduct for which a defendant has been acquitted." The *Dowling* case is instructive because, like the present case, it involved evidence of uncharged crimes. The defendant in *Dowling* had been acquitted of burglary and attempted robbery, but evidence relating to those charges nonetheless was introduced against him in a subsequent prosecution for a different robbery. The evidence of the uncharged crime was relevant to establish the defendant's modus operandi. Introduction of such evidence did not violate the collateral estoppel doctrine, because "the prior acquittal did not determine an ultimate issue in the present case." (*Id.* at p. 348 [110 S.Ct. at p. 672].) Because in the subsequent trial the prosecution was not required to establish beyond a reasonable doubt the defendant's identity as the robber in the uncharged crime involved in the prior trial, collateral estoppel principles did not bar introduction of that evidence in the subsequent unrelated trial.

Also instructive is this court's decision in *People v. Santamaria, supra*, 8 Cal.4th 903. In that case we determined that (assuming the doctrine of collateral estoppel applied to retrial of the same case) a prior not true finding on an allegation that a defendant had used a knife in connection with a murder did not, at a subsequent retrial for the murder, bar evidence establishing the defendant's use of the knife. We explained: "[T]he jury's not true finding on the enhancement allegation does not mean defendant did not use the knife, only that there was a reasonable doubt that he did. In *Ashe* [*v. Swenson, supra*, 397 U.S. 436], the verdict, viewed realistically, showed the jury had a reasonable doubt as to the defendant's identity as the robber. That doubt necessarily precluded conviction of the robbery charge. But the same

doubt as to the knife use did not preclude a murder conviction here, although it did mandate a not true enhancement finding. [¶] Evidence that defendant personally used a knife was highly relevant to show that he was guilty of murder as that offense is defined by statute. That evidence, together with the evidence that if he did not use a knife, he was guilty as the aider and abettor, combined to permit the murder conviction. But the specific fact of personal use does not have to be proved beyond a reasonable doubt to find defendant guilty of murder. Hence, personal use is not an 'ultimate fact' of murder." (*People v. Santamaria, supra,* 8 Cal.4th at p. 922, italics omitted.)

Examining the same case, the Ninth Circuit Court of Appeals agreed: "In this case, the State failed to prove beyond a reasonable doubt the ultimate fact that Santamaria used a knife for the weapon enhancement in the first trial. However, to convict him of murder under California law, the State is not required to prove beyond a reasonable doubt that Santamaria used a knife. [Citation.] Therefore, the use of a knife is not an ultimate fact for the retrial, and the State cannot be precluded from presenting evidence that Santamaria stabbed the victim." (*Santamaria v. Horsely* (9th Cir. 1998) 133 F.3d 1242, 1247; see also *People v. Memro* (1995) 11 Cal.4th 786, 821-822 [12 Cal.4th 783d, 47 Cal.Rptr.2d 219, 905 P.2d 1305] [the trier of fact's finding at a prior trial that a felony-murder special circumstance was not true did not collaterally estop the retrial of the murder charge on a felony-murder theory].) ▮ As with the not true finding on the knife-use allegation in *Santamaria,* and the felony-murder allegation in *Memro,* the not true finding on the murder for financial gain special-circumstance allegation in the trial for Glenna's murder merely established that the state in the prior proceeding had been unable to prove beyond a reasonable doubt that defendant had murdered Glenna for financial gain as charged in the murder for financial gain special circumstance. In the present case, however, the prosecution was not required to establish that fact beyond a reasonable doubt or, indeed, to prove it at all.

Defendant claims that special circumstance allegations necessarily are part of the prosecutor's burden of proof in a capital case, unlike the personal use of a knife in a prosecution for murder. He contends that "determination of a special circumstance is an ultimate fact" and that the financial-gain special-circumstance allegation relating to the murder of Glenna could not be relitigated. His contention is unpersuasive, because although the financial-gain special-circumstance allegation formed part of the prosecutor's burden of proof in the trial for the murder of Glenna, there was no special circumstance allegation in the present case that defendant had murdered Glenna for financial gain. Such an allegation relating to the murder of Glenna was not charged and was not part of the prosecutor's burden of proof at the guilt

phase in the present case and, indeed, it was not being relitigated at all in this proceeding.·

Defendant relies upon *Bullington v. Missouri* (1981) 451 U.S. 430 [101 S.Ct. 1852, 68 L.Ed.2d 270] in support of his claim that once a special circumstance allegation is found not true, it may not be retried.

The court in *Bullington* determined on double jeopardy grounds that the prosecution could not seek the death penalty on retrial of a case in which the jury originally had imposed a life sentence. Under Missouri law, the prosecution was required to prove certain facts beyond a reasonable doubt at the penalty hearing, and the jury's penalty determination had "the hallmarks of the trial on guilt or innocence." (*Bullington v. Missouri, supra*, 451 U.S. at p. 439 [101 S.Ct. at p. 1858].) Accordingly, the defendant could not be subject to retrial as to penalty after the trial court granted his motion for new trial on the basis of guilt phase error.

The *Bullington* case does not assist defendant's present claim, because the court in that case did not determine that in a trial for *different* capital crimes, evidence regarding a crime of which the defendant was convicted but for which the death penalty was not imposed could not be admitted. The case merely established that factual findings favorable to the defendant made at the penalty phase of a capital trial barred retrying the penalty determination in that case. The *Bullington* case does not stand for the proposition that evidence relevant to a special circumstance allegation that was found not true—and also relevant to the underlying murder, of which a defendant was convicted—cannot be admitted for the purpose of establishing guilt of different crimes in a separate trial.[9]

Defendant maintains, however, that it was "inherently unfair" to admit evidence of financial gain related to the murder of Glenna after the not true finding on the financial-gain special-circumstance allegation in the trial for Glenna's murder. He continues: "Although, technically appellant was not being tried a second time for Glenna's murder, the introduction of the Glenna financial gain evidence had that effect. The prosecution's sole purpose for introducing financial gain evidence from appellant's Monterey County trial [involving Glenna's murder] into appellant's Kern County case was to support the prosecution's theory that Joyce was murdered, rather than died of natural causes, and that the financial gain special circumstance charged in Count II, Martha's homicide, was true."

---

[9]Contrary to defendant's claim, this evidence was not made inadmissible by section 1118.2, which provides: "A judgment of acquittal entered pursuant to the provisions of Section 1118 or 1118.1 shall not be appealable and is a bar to any other prosecution for the same offense." Defendant was not being prosecuted for the murder of Glenna, and no appeal of the not true finding on the financial gain special circumstance was attempted.

Defendant's own argument rebuts the claim that the introduction of evidence of financial gain constituted a retrial of the charge involving the murder of Glenna. The evidence was admitted to establish facts regarding the murders of Joyce and Martha, not to relitigate defendant's responsibility for murdering Glenna for the purpose of financial gain. Defendant claims that when, in the present case, the jury learned that defendant had received a sentence of life without possibility of parole for Glenna's murder, they decided to punish him more severely. This claim is speculative and is unrelated to defendant's claim that the evidence at the trial for Glenna's murder should have been excluded at the guilt phase. We observe additionally that this argument was not raised below as a basis for excluding the evidence at the guilt phase, and is waived on appeal. (See *People v. Ashmus, supra*, 54 Cal.3d at p. 973, fn. 10.)

Defendant objects to the manner in which the prosecutor employed evidence of defendant's financial motivation to kill Glenna. Defendant refers to the prosecutor's use of this evidence to support the claim that defendant also murdered Joyce and Martha in part for financial reasons. Defendant contends that the evidence was irrelevant to the charge that defendant murdered Joyce, because no financial gain special circumstance was alleged as to her. This claim is not persuasive, because evidence of defendant's motive for killing Joyce was relevant to the charge that defendant had murdered her, even without a financial gain special circumstance. He makes the additional claim that the evidence regarding defendant's receipt of life insurance proceeds on Glenna's death "lent undue weight" to the "weak" evidence that defendant killed Martha for financial gain. Defendant's claim goes to the weight, and not to the admissibility, of the evidence. As long as the evidence properly was admitted, as we have determined it was, the weight to be accorded the evidence was for the jury to decide.

Defendant also notes that the jury was not instructed at the guilt phase of the present case that the financial-gain special-circumstance allegation in the trial for Glenna's murder had been found not true. Defendant did not request such an instruction and, indeed, made every effort not to disclose to the jury that he had been tried for Glenna's murder. An instruction that the special circumstance allegation that he had murdered Glenna for financial gain had been found not true could give rise to an inference that, despite the not true finding on the special circumstance allegation, he previously had been tried and convicted of the murder of Glenna. Because of the potential for prejudice arising from the instruction which defendant now claims should have been given, no sua sponte duty to give such an instruction should be imposed. (See § 190.1, subd. (b) [providing for trial of a prior murder conviction special-circumstance allegation only after a guilty verdict has been reached on the charged crimes].)

Defendant claims that as part of the guaranty against cruel and unusual punishment provided by the Eighth Amendment of the United States Constitution, any evidence is unreliable that relates to a crime as to which the defendant has been acquitted. He cites in support *Beck v. Alabama* (1980) 447 U.S. 625 [100 S.Ct. 2382, 65 L.Ed.2d 392]. That opinion does not support his claim. In *Beck*, the high court disapproved a state rule limited to capital cases, that prohibited the fact finder from considering a lesser included offense within the capital charge, thereby forcing an all-or-nothing choice between the death penalty and acquittal. (*Id.* at p. 637 [100 S.Ct. at pp. 2389-2390]; see also *People v. Waidla, supra,* 22 Cal.4th at p. 736, fn. 15; *People v. Breverman* (1998) 19 Cal.4th 142, 166-167 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Although the high court in that case observed that it has "invalidated procedural rules that tended to diminish the reliability of the sentencing determination" and of the guilt determination (*Beck v. Alabama, supra,* 447 U.S. at p. 638 [100 S.Ct. at p. 2390]), defendant has not produced any authority suggesting that otherwise admissible evidence relating to an allegation found not true necessarily must be excluded as unreliable at the guilt phase of a capital trial for a *different* crime. (See *People v. Jenkins, supra,* 22 Cal.4th at p. 1044 [discussing the scope of the reliability requirement under the Eighth Amendment of the United States Constitution].)

### 7. *Collateral estoppel—introduction of evidence regarding the murders of Martha and Joyce*

 Defendant contends that, under the collateral estoppel doctrine of the state and federal Constitutions, rulings by the trial court at his Monterey County trial for the murder of Glenna should have barred the trial court in the present case from admitting evidence concerning the murders of Martha and Joyce. As we shall explain, this contention clearly lacks merit.

Defendant alleges that in the Monterey County trial, the court had before it the preliminary hearing transcripts for the charged murders of Joyce and Martha, and the prosecution sought to introduce evidence of both of those murders at the guilt phase of the Monterey proceedings, pursuant to Evidence Code section 1101, subdivision (b). According to defendant, the trial court excluded from the guilt phase of the Monterey County trial all evidence suggesting that defendant had murdered Joyce, on the ground that the prosecution had not established defendant's commission of that crime even by a preponderance of the evidence. Defendant further alleges that although the trial court permitted the prosecution to introduce evidence of Martha's murder at the guilt phase of the Monterey County trial, the court subsequently refused to permit the prosecution to rely upon that murder as a factor in aggravation at the penalty phase, on the ground that the prosecution's

evidence failed to establish beyond a reasonable doubt defendant's culpability for murdering Martha.

As noted, defendant contends that these alleged rulings by the trial court in the Monterey County proceeding operated, by virtue of the collateral estoppel doctrine, to preclude the trial court in the present proceeding from admitting evidence concerning the murders of Martha and Joyce. In essence, defendant claims that the charges should have been dismissed, because without evidence of the murders of Martha and Joyce the prosecution would be unable to carry its burden of proof.

Defendant did move at trial in the present case to dismiss count one, involving the murder of Joyce, on collateral estoppel grounds. He did not move to dismiss count two, involving the murder of Martha. His claim as to that count may not be raised for the first time on appeal. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1201 [65 Cal.Rptr.2d 240, 939 P.2d 354] [plea of once in jeopardy cannot be raised for the first time on appeal except in the context of a claim of ineffective assistance of counsel]; *People v. Marshall* (1996) 13 Cal.4th 799, 824, fn. 1 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) To the extent any failure on the part of counsel to raise a meritorious claim below could have constituted ineffective assistance of counsel, we reach the merits of the claim as to each count. (See *People v. Marshall, supra,* 13 Cal.4th at p. 824, fn.1.)

The record in the present case does not contain the hearing in the Monterey County trial court with respect to the evidence of the murders of Martha and Joyce, so we cannot comment on the basis for the Monterey trial court's determination. Even if we assume that defendant's assertions regarding the Monterey trial court's ruling are correct, however, it is clear that defendant's guilt or innocence of the crimes of murdering either Martha or Joyce were not issues of ultimate fact to be determined in the Monterey County trial for the murder of Glenna. Defendant was not acquitted of the murders of Joyce and Martha in Monterey County. (See *Gikas v. Zolin* (1993) 6 Cal.4th 841 [25 Cal.Rptr.2d 500, 863 P.2d 745]; see also *People v. Davis* (1995) 10 Cal.4th 463, 514 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Further, just as the trial court in the present case, involving defendant's prosecution for the murders of Joyce and Martha, properly could admit evidence supporting the inference that defendant had killed Glenna for financial gain despite the finding of the trial court in a separate trial for the murder of Glenna that the murder for financial gain special circumstance had not been proved, the trial court properly could permit defendant's prosecution for the murders of Martha and Joyce despite the circumstance that in another trial on a different charge, a court had determined that the evidence

then before the court at a hearing on the admissibility of evidence of other crimes did not establish defendant's guilt of the murders of Martha and Joyce. Defendant does not provide authority, and our research has not produced support, for the claim that a murder may not be prosecuted if in a prior prosecution for a *different* crime, evidence regarding that murder was not considered strong or reliable enough to be admitted as evidence of guilt or as evidence supporting a factor in aggravation.

### 8. *Marital privilege*

Defendant contends that the trial court erred in denying his motion to exclude the testimony of Edith Ballew recounting that defendant had told her that his parents previously had threatened to disinherit him when they were displeased with his conduct. Defendant, asserting that he was married to Ballew at the time of this communication, contends that the court should have excluded this testimony as a confidential marital communication pursuant to the marital privilege. (Evid. Code, § 980.)

Defendant and Ballew were not legally married at the time of the communication, because defendant's divorce from his second wife was not final when he and Ballew went through a marriage ceremony. ▮ The marital privilege applies only in the case of a valid marriage. (*People v. Badgett* (1995) 10 Cal.4th 330, 363 [41 Cal.Rptr.2d 635, 895 P.2d 877].) This court specifically has held that the privilege does not apply when a person enters into a second marriage before his or her first marriage legally is dissolved. (*People v. Gallego* (1990) 52 Cal.3d 115, 176-177 [276 Cal.Rptr. 679, 802 P.2d 169].)

Defendant requests that we reconsider our holding in *People v. Gallego*, *supra*, 52 Cal.3d 115. He acknowledges that there are two strands to the marital privilege and that it may be appropriate to deny the privilege not to testify against a spouse when the purported marriage is void, because that element of the privilege is based upon the common law rule that spouses are incompetent to testify against each other. He claims, however, that a different rule should apply to that element of the spousal privilege protecting confidential marital communications. In order to promote marital harmony and free communication, he asserts, the privilege should extend to void and voidable marriages. In addition, he claims that our decision in *People v. Gallego*, *supra*, 52 Cal.3d 115, erroneously fails to distinguish between intentional bigamy and bigamy entered into in a good faith but mistaken belief that a prior marriage has been dissolved legally.

We do not believe that defendant has offered persuasive grounds for reconsidering the rule that the marital privilege applies only in the case of a

valid marriage. The rule expressed in the *Gallego* opinion is the rule in most, if not all, other jurisdictions (see 81 Am.Jur.2d (1992) Witnesses, § 300, pp. 285-286; Note, *"Honey, the Judge Says We're History": Abrogating the Marital Privileges via Modern Doctrines of Marital Worthiness* (1992) 77 Cornell L.Rev. 843, 850), and defendant has not provided authority to support his contrary claim. Defendant also has not provided authority directing that a bona fide belief in the validity of a marriage constitutes a basis for the application of the marital privilege. Further, defendant did not claim at trial that he had a good faith belief in the validity of his marriage that should support application of the marital privilege, and in any event, even if he could establish error, any error was harmless given the relative insignificance of the challenged testimony.[10]

### 9. *Expert opinion testimony*

 Defendant contends that the trial court erred in permitting unqualified witnesses to give expert opinion testimony. He claims that Dr. John Ford, a clinical toxicologist employed at the Chevron Environmental Health Center, with a Ph.D. in physiology and pharmacology, was not qualified to testify regarding the cause of Joyce's death or regarding the effect that hypertension and age would have had on Martha's kidney function. He also contends Dr. Ford was unqualified to testify as an expert regarding the time at which Glenna might have ingested paraquat in order to produce the symptoms she displayed.[11] He maintains that because Dr. Ford was not a medical doctor and did not have training in pathology, he was unqualified to render an opinion on these subjects.

 "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) An expert witness's testimony in the form of an opinion is limited to a subject "that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).) A claim that expert opinion evidence improperly has been admitted is reviewed on appeal for abuse of discretion. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1207 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)

Qualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion. (*People v. Villarreal* (1985) 173

---

[10]Defendant's perfunctory claim that the admission of this evidence constituted a denial of due process of law and a violation of the Eighth Amendment guarantee of a reliable guilt and penalty determination was not raised below, and it is without merit.

[11]Respondent contends this claim with respect to Glenna was waived because defendant failed to object below. The record is equivocal with respect to the basis for defendant's objection, and we reach the merits of the claim in order to avoid uncertainty in the event of a later claim of ineffective assistance of counsel.

Cal.App.3d 1136, 1142 [219 Cal.Rptr. 371] ["Because of the dramatic growth of diverse interdisciplinary studies in recent times, often individuals of different nonphysician professions are called upon to give medical opinions or at least opinions involving some medical expertise"]; see *People v. Fierro* (1991) 1 Cal.4th 173, 224 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *Brown v. Colm* (1974) 11 Cal.3d 639, 645 [114 Cal.Rptr. 128, 522 P.2d 688] [referring to an "unmistakable general trend in recent years . . . toward liberalizing the rules relating to the testimonial qualifications of medical experts"].)

We are persuaded that the trial court did not abuse its discretion in determining that Dr. Ford was qualified to testify on the points disputed by defendant. Dr. Ford had advanced training in occupational medicine, physiology, and pharmacology, and had worked in the area of agricultural poison toxicology for 18 years. He had specialized experience in paraquat toxicology, having been employed at a health center operated by the sole distributor of paraquat in the United States, having consulted and advised physicians in many cases of paraquat poisoning, having participated in many research projects and in biannual conferences on the subject of paraquat toxicology, and having provided laboratory services to analyze human tissue samples connected with incidents of paraquat poisoning.

Defendant raises a similar claim with respect to the testimony of Dr. Armand Dollinger, a medical doctor who specialized in pathology and who conducted the autopsy on Martha. Defendant contends that because Dr. Dollinger had no previous experience with the particular field of paraquat poisoning, he had no basis for stating an opinion, based on a toxicology report disclosing the presence of paraquat in Martha's lungs and liver, that she had died of paraquat poisoning. "Permitting Dr. Dollinger to so testify," defendant asserts, "is analogous to permitting a psychiatrist to testify as an expert on oncology, based on a third party report stating his patient had cancer. In neither instance does the third party report confer expert status on the doctor so as to qualify him to render a valid opinion on cause of death."

We believe that the analogy drawn by defendant is flawed. Whether or not psychiatrists, by virtue of their medical training, might be qualified to interpret laboratory reports relating to cancer, a pathologist commonly has expertise in interpreting both the clinical evidence of disease or tissue damage and laboratory results showing the presence of disease agents or toxic materials in human tissue. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 766 [60 Cal.Rptr.2d 1, 928 P.2d 485] [the pathologist who conducts an autopsy generally is permitted to testify as to cause, means, and time of death].) Dr. Dollinger testified that he had performed in excess of 11,000

postmortem examinations or autopsies and that he had studied the medical and scientific literature regarding paraquat toxicology. We do not believe that Dr. Dollinger's reliance upon laboratory results performed by other professionals required the trial court to find him unqualified to offer an expert opinion on the cause of Martha's death. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Opinion Evidence, § 331, p. 564 ["A doctor may base an opinion on a diagnosis or examination made by another doctor"].) Dr. Dollinger had sufficient specialized training, in addition to the particular experience of having performed the autopsy on Martha, to have reached an informed conclusion as to the cause of her death, despite the circumstance that he had not previously performed an autopsy in a case in which the cause of death was paraquat poisoning.[12]

### 10. *Chain of custody*

Defendant contends that there was a break in the chain of custody of the tissue that was removed from Joyce's body during the autopsy. He contends that this break cast doubt on the origin of the tissue ultimately analyzed by Dr. Stephens and relied upon by him to support the conclusion that Joyce died of paraquat poisoning. He asserts that although the tissue blocks were labeled when they were removed, prepared for analysis, and deposited in the hospital safe after the autopsy in 1976, some of the tissue received at Stanford Hospital in 1984 and thereafter transmitted to Dr. Stephens for analysis was not marked with the coroner's label. Defendant also contends that the prosecution failed to fulfill its duty properly to preserve material evidence, but he fails to offer any authority or argument in support of this claim, so it is not considered here. (See *People v. Hardy* (1992) 2 Cal.4th 86, 150 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

At trial, defendant objected to testimony by Dr. Stephens that the slides analyzed by him reflected that Joyce died of paraquat poisoning, on the ground that there was an inadequate foundation for this opinion testimony. On each occasion, the trial court overruled the objection without prejudice to renewal if further prosecution witnesses were unable to supply links in the chain of custody. Defendant does not assert that the objection was renewed, and our reading of the record does not disclose further objection. Respondent contends that defendant waived his chain of custody claim because, at the close of the prosecutor's case-in-chief, defendant stipulated that although the medical records relied upon by the various expert witnesses would not be presented to the jury, the jury could rely, for the truth of that testimony, upon

---

[12]We do not reach defendant's claim that error by the trial court in admitting the expert opinion testimony constituted a violation of various constitutional rights, because we have determined that the trial court did not abuse its discretion in admitting this evidence.

the expert witnesses' testimony characterizing the contents of the medical records. We do not believe that this stipulation clearly constituted a waiver of the chain of custody claim. The trial court already had rejected defendant's objection to Dr. Stephens's opinion testimony on chain of custody grounds. The stipulation merely served to relieve the jury of the burden of examining voluminous medical records, and did not constitute a withdrawal of the previous chain of custody objection.

Whether or not there was a waiver, either because of the stipulation or because of defendant's apparent failure to renew the objection after the prosecution supplied additional chain of custody witnesses, we reject on the merits defendant's contention that Dr. Stephens's opinion testimony that Joyce died of paraquat poisoning should have been excluded on chain of custody grounds.

In a chain of custody claim, " '[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight.' [Citations.]" (*People v. Diaz, supra,* 3 Cal.4th at p. 559; see also Méndez, Cal. Evidence (1993) § 13.05, p. 237 ["While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering"].) The trial court's exercise of discretion in admitting the evidence is reviewed on appeal for abuse of discretion. (*County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1448 [232 Cal.Rptr. 471].)

We conclude that the trial court did not abuse its discretion in overruling defendant's objection to Dr. Stephens's testimony based on chain of custody.[13] The tissue was removed at the autopsy and immediately was labeled with the autopsy number A-26-76. It was cut into pieces and placed in a cassette marked A-26-76 and transmitted to a technician who processed

---

[13]We do not reach defendant's contention that any failure to preserve the claim for appeal constituted ineffective assistance of counsel or that error in admitting the evidence constituted a due process violation, because we reject the claim that the prosecution failed to establish an adequate chain of custody.

it into slides that also were labeled with the autopsy number. The labeled tissue blocks were placed in a container in a drawer and went into storage at Mercy Hospital.

In 1984, a labeled box of slides was transferred from Mercy Hospital storage to the Kern County Coroner's Office storage safe. A Kern County Coroner's Office investigator obtained a box labeled A-26-76 from the safe and mailed the labeled box to a physician at the Stanford University School of Medicine's Department of Pathology. The package contained 10 tissue blocks, two of which were missing their labels. Each of the 10 tissue blocks received at Stanford was assigned a Stanford number. A technician at Stanford prepared two sets of slides from tissue from each of the 10 blocks. The tissue was sent to Dr. Boyd Stephens in San Francisco. Dr. Stephens examined one or more slides from each of the 10 tissue blocks. It was based upon the examination of these slides that Dr. Stephens testified that he believed that Joyce died by paraquat poisoning.

We do not agree with defendant that Dr. Stephens's opinion was based upon tissue samples of unknown origin. Although some of the tissue blocks prepared at the time of the autopsy lost their identifying labels while they were stored at Mercy Hospital, all of the blocks were contained in a box bearing the label A-26-76, and there is no indication of tampering. We note that the storage area had some security in that it required persons entering to sign in. In addition, Dr. Stephens examined slides from all the tissue blocks —most of which were labeled properly—and formed the opinion not only that the tissue indicated paraquat as a cause of death, but that all the slides came from the same person. Dr. Stephens reached the latter opinion not because of anything distinctive about the tissue itself, but because of the matching shape and outline of the samples as they had been cut from the tissue blocks. The circumstance that Dr. Swinyer and Dr. Kilburn testified that unlabeled tissue slides could not be identified as coming from the same person, at least without DNA testing, went to the weight of Dr. Stephens's opinion, not the admissibility of the evidence.

Dr. Stephens's opinion was based upon an examination of the slides, the great majority of which came from tissue blocks that at all times had been properly labeled. All the tissue blocks, including the unlabeled ones, were stored together at Mercy Hospital and arrived in a container labeled A-26-76. The trial court could conclude with reasonable certainty that no alteration of evidence had occurred.

In addition, Dr. Stephens's opinion was not based solely on the tissue analysis, but also on the hospital records of the clinical course of Joyce's illness as well as autopsy observation of pulmonary fibrosis.

Finally, we note that the cause of Joyce's death was not established solely through examination of the tissue sent to Dr. Stephens, as to which there was a chain of custody objection. Other tissue obtained by Dr. Swinyer at the time of Joyce's autopsy was sent in 1976 to Dr. Kilburn, an expert on lung pathology, and he too formed the opinion that the cause of death was paraquat poisoning.

11. *Hearsay evidence*

Defendant contends the trial court erred in overruling hearsay objections to testimony by Dr. Kilburn and Dr. Ford.

In 1976, Dr. Kilburn, a specialist in lung pathology, received lung tissue gathered by Dr. Swinyer at Joyce's autopsy, which he caused to be prepared into slides. He also received lung tissue slides from Dr. Stephens in 1986. Both samples of Joyce's tissue revealed the same structural damage to the lungs—destruction of the alveolar structure and replacement of alveolar spaces with dense collagenous connective tissue. He testified: "The predominant process was that the alveoli, the alveolar spaces were filled with this exuberant scarring, and in some places the alveolar walls themselves were scarring in this manner. And what this . . . did was totally exclude the possibility of air going into those areas. Air must go into the alveoli for gas exchange, for oxygen to be taken up out of the air to go into the blood. There are almost no areas in any of the sections I looked at, whether they were from those that I had made in my laboratory or that Dr. Stephens had made, that showed air spaces, and none of the air spaces, even when they were present, were normal. They had lost their lining. They had lost their normal blood vessels and instead were replaced by this gristly, dense, connective tissue." He had observed this kind of damage in cases of known paraquat poisoning. When asked his opinion of what caused the fibrosis in Joyce's lungs, he answered: "Well, the clinical course, the appearance of the tissue and the time after her illness, the failure to see any regeneration or repair or anything, really, in the way of inflammation bespeaking infection, all pointed to this being chemical in its origin, and of the chemicals, paraquat is the only one that produces this kind of fibrotic proliferative change and does it cataclysmically, I mean does it within days . . . ."

When asked whether he consulted any other persons regarding Joyce's tissue, he stated that a few days after he received the tissue in 1976 and prepared the slides, he showed the slides to a colleague. Without ever telling this expert, Dr. Thurlbeck, anything about their origin, Dr. Kilburn asked him to examine the slides. Dr. Kilburn testified that Dr. Thurlbeck examined them for two minutes and said, "You've got a perfect example of paraquat

poisoning here." Dr. Thurlbeck stated that he had experience with cases of paraquat poisoning in England, and that he did not have any doubt that the slides of Joyce's tissues exhibited such poisoning. Defendant's hearsay objection was overruled, the court observing that the hearsay was elicited for the purpose of explaining Dr. Kilburn's opinion testimony. When the prosecutor asked Dr. Kilburn what effect Dr. Thurlbeck's opinion had on his own opinion, the witness stated: "I was already convinced from my experience, but, you know, it's comforting to know that another person . . . comes to the same conclusion and comes to it without any prompting or without any additional information."

We have explained that "[a]n expert may generally base his opinion on any 'matter' known to him, including hearsay not otherwise admissible, which may 'reasonably . . . be relied upon' for that purpose. [Citations.] On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. However, prejudice may arise if, ' "under the guise of reasons," ' the expert's detailed explanation ' "[brings] before the jury incompetent hearsay evidence." ' " (*People v. Montiel* (1993) 5 Cal.4th 877, 918 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; see Evid. Code, § 801, subd. (b); *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 [59 Cal.Rptr.2d 356, 927 P.2d 713].) In this context, the court may " 'exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.' " (*People v. Carpenter, supra,* 15 Cal.4th at p. 403.)

Nonetheless, "[b]ecause an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment." (*People v. Montiel, supra,* 5 Cal.4th at p. 919.)

Although it is appropriate for a physician to base his or her opinion in part upon the opinion of another physician (*People v. Campos* (1995) 32 Cal.App.4th 304, 308 [38 Cal.Rptr.2d 113]; see also *Whitfield v. Roth* (1974) 10 Cal.3d 874, 895 [112 Cal.Rptr. 540, 519 P.2d 588]; Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 801, p. 19 ["A physician may . . . rely on reports and opinions of other physicians"]), it generally is not appropriate for the testifying expert to recount the details of the other physician's report or expression of opinion. (*People v. Campos, supra,* 32 Cal.App.4th at p. 308; see *People v. Coleman* (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189]; *Whitfield v. Roth, supra,* 10 Cal.3d at pp. 894-895; 1 Jefferson, Cal. Evidence Benchbook (3d ed. 1997) §§ 29.42-29.43, pp. 597-598; Méndez, *supra,* Cal. Evidence, § 16.03, pp. 312-313;

Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 1999) ¶ 8.763.)

In the present case, we need not determine whether Dr. Kilburn's account of the comments of a nontestifying physician went beyond the proper purpose of permitting the jury to evaluate the basis for Dr. Kilburn's testimony, because even if error occurred it was not prejudicial. The court twice stated that the evidence was being received only for the purpose of indicating the basis for the witness's opinion. Dr. Kilburn's reference to Dr. Thurlbeck was brief and, moreover, other reliable expert witnesses testified consistently and explained that in their opinion, the slides of Joyce's lungs reflected paraquat poisoning. The prosecutor did not refer to Dr. Thurlbeck's opinion in his argument to the jury, and even Dr. Kilburn's testimony was relied upon only to a limited degree. It is not reasonably probable that a result more favorable to defendant would have occurred in the absence of the admission of this evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[14]

Defendant claims perfunctorily that the trial court should have sustained his hearsay objection to Dr. Kilburn's statement that Kilburn had been informed by Dr. Stephens that the slides Kilburn received from Stephens were from Joyce. We readily reject this claim. The testimony was permissible under Evidence Code section 801, subdivision (b), and even if that were not the case, any error would be harmless, because the chain of custody was established satisfactorily through other testimony.

Defendant also contends that Dr. Ford should not have been permitted to testify that he based his opinion regarding the time that Glenna had ingested paraquat in part on her statements, as recorded in her medical records, that she had vomited violently and had tarry stools on February 20, 21, and 22, 1984, after her return from a trip to Las Vegas that was made without defendant. Dr. Ford's testimony explaining the basis for his opinion clearly was permissible under Evidence Code section 801, subdivision (a). (See *People v. Wilson* (1944) 25 Cal.2d 341, 348 [153 P.2d 720]; 1 Witkin, Cal.

---

[14]Defendant also contends that any such error constituted a violation of his Sixth Amendment right to confrontation and of parallel rights under the California Constitution, reviewable under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065] [harmless beyond a reasonable doubt]). Defendant did not object on this ground below, and thus his constitutional claim has not been preserved for appeal. (*People v. Waidla, supra,* 22 Cal.4th at p. 726, fn. 8; *People v. Rowland, supra,* 4 Cal.4th at p. 265, fn. 4; see *People v. Carpenter, supra,* 15 Cal.4th at p. 385; *People v. Mickey* (1991) 54 Cal.3d 612, 689 [286 Cal.Rptr. 801, 818 P.2d 84].) Further, even assuming for the purpose of discussion that the admission of Dr. Thurlbeck's declarations implicated defendant's rights under the confrontation clause, any error would be harmless beyond a reasonable doubt.

Evidence, *supra*, Opinion Evidence, § 33, pp. 564-565; 1 Jefferson, Cal. Evidence Benchbook, *supra*, § 29.41, p. 596.) His ability, as a nonphysician, to interpret medical records and patient symptoms went to the weight, and not the admissibility, of his testimony. As we have determined above, Dr. Ford was qualified to give opinion testimony of a medical nature.

### 12. *Sufficiency of the evidence*

Defendant contends that there was insufficient evidence to support his conviction for the murders of Martha and Joyce, and to support the true finding on the multiple-murder special circumstance. His conviction, he asserts, constituted a violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and parallel provisions of the California Constitution. Defendant asserts that "for both Joyce's and Martha's deaths, the crucial link between appellant, victim and poison *at the time of the crime* simply did not exist."

██ A reviewing court faced with such a claim determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560], italics omitted; see also *People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Wader* (1993) 5 Cal.4th 610, 640 [20 Cal.Rptr.2d 788, 854 P.2d 80].) Further, "the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft, supra*, 23 Cal.4th at p. 1053.) This standard applies whether direct or circumstantial evidence is involved. "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Id.* at pp. 1053-1054.) As we shall explain, we conclude that the evidence clearly is sufficient to sustain defendant's conviction for the murders of both Joyce and Martha.

The elements of a charge of murder are an unlawful killing with malice aforethought. (§ 187, subd. (a).) Murder perpetrated by means of poison is murder of the first degree. (§ 189.)

██ With respect to the murder of Joyce, we believe that there was evidence that is "reasonable, credible and of solid value" that defendant perpetrated an unlawful killing with malice aforethought, and that he did so by means of poison. Credible evidence established that in 1970 he made statements indicating his awareness of the extreme toxicity of paraquat and its danger to human life. He said he kept his parents' garden attractive with herbicides he obtained at work, and he displayed to a witness a poison defendant stated would achieve the "perfect murder" because it could not be detected in the victim's body and there was no antidote. In the summer of 1975, he warned his stepson, Joyce's child, about agricultural poisons, including paraquat, and stated that he had been acquainted with a person who sprayed nearby fields with such poisons, including paraquat, for a couple of years. He told the child not to enter the garage because of the dangerous chemicals stored in it. Credible evidence also established that defendant had access to paraquat when he worked for Superior Farming from February to July 1976 and from November 1976 to April 1977. Defendant had access to Joyce, with whom he was living at the time of the murder. In 1985, a bottle of paraquat (dated after Joyce's murder) bearing his fingerprint was found in a garage to which he had access, although he denied knowingly possessing the substance.

Although defendant's possible motive was not an element of the prosecution's burden of proof, prosecution evidence disclosed that defendant had engaged in extramarital affairs while married to Joyce, that the couple had argued over his infidelity, and that he received several thousand dollars in insurance proceeds upon Joyce's death. There was evidence of consciousness of guilt, in that defendant exhibited grief at Joyce's funeral but seemed lighthearted immediately thereafter. A jailhouse informant also testified that defendant, after his 1985 arrest, had stated that he had "killed the bitches."

Substantial, reliable, and credible expert opinion testimony, based upon the clinical course of Joyce's illness and the results of an autopsy, supported the conclusion that Joyce died of paraquat poisoning, despite the circumstance that, in light of the tests available at the time of Joyce's death, it had not been possible to detect the presence of paraquat in her tissue. Her symptoms, from the vomiting and diarrhea that characterized the early phase of her illness, to fever, kidney dysfunction, respiratory distress, and ultimately respiratory failure due to extensive fibrosis in the lungs, constituted a typical progression of paraquat poisoning. The appearance and weight of her lungs after death, and the appearance of lung tissue slides examined by several experts, also were typical of paraquat poisoning and, indeed, were not consistent with any other cause of death, in the view of several experts.

Finally, other-crimes evidence demonstrated that defendant also had killed Martha and Glenna pursuant to the same scheme or plan, a circumstance

that, we have concluded, legitimately could be considered by the jury in finding guilt.

Defendant points to evidence that assertedly demonstrates Joyce did not die of paraquat poisoning, including her death certificate indicating that she died of respiratory failure caused by undetermined microorganisms, the failure of any laboratory or physician to find paraquat in her tissue, the lack of direct evidence of paraquat administration by defendant or anyone else, and the testimony of a defense expert that Joyce's death could have had a cause other than paraquat poisoning. He also asserts that there was no direct evidence that he possessed paraquat, and he points out that the container of paraquat that bore his fingerprint was manufactured or filled in April 1977, almost a year after Joyce's death, and was seized after his 1985 arrest. He contends that testimony concerning his statements indicating his familiarity with paraquat was unreliable due to the passage of time and the youth of the witness, and that the statements did not constitute direct evidence that he possessed or administered paraquat. He also notes some inconsistencies in testimony regarding the timing of his statements suggesting financial gain as one motive for the murder of Joyce. Finally, he stresses that Dr. Stephens, a prosecution expert, testified that he would be unable to conclude beyond a reasonable doubt that paraquat caused Joyce's death without relying in part on the evidence that Martha and Glenna also died of paraquat poisoning, and that Drs. Einstein and Kilburn had testified only that paraquat was the likely cause of Joyce's death, with Dr. Kilburn retaining some doubt as to the cause of death.

Defendant's contentions essentially constitute an effort to relitigate the question of his guilt. Although defendant presented some evidence and arguments in his favor at trial, the record discloses substantial credible evidence in support of the jury's verdict. Our examination of the record discloses that Dr. Kilburn testified that he believed beyond a reasonable doubt that Joyce died from ingesting paraquat. Dr. Einstein was strongly of the opinion that she died of paraquat poisoning. Dr. Stephens stated that the tissue slides alone would not have demonstrated the cause of Joyce's death but, properly relying upon clinical evidence regarding the course of her disease and upon the paraquat poisoning of defendant's mother and another of defendant's wives, he expressed the opinion, held beyond a reasonable doubt, that Joyce died of paraquat poisoning. The experts' reliance upon evidence of other paraquat poisonings attributed to defendant does not demonstrate that their opinion that Joyce died of paraquat poisoning did not constitute credible evidence of solid value, or that the opinion of the experts was based upon conjecture and speculation. (See Evid. Code, § 801.) The expert opinion testimony did not constitute, nor did it rely upon, character or

propensity evidence, nor did it go to any question of defendant's intent or mens rea. (Cf. *People v. McFarland* (2000) 78 Cal.App.4th 489 [92 Cal.Rptr.2d 884] [it is error for an expert to testify, based on defendant's prior convictions, that in the current case the defendant was motivated by abnormal sexual interest].) Rather, it was reasonable to conclude that the probability was exceptionally low that Joyce's death, which bore the clinical signs of paraquat poisoning, was not actually a paraquat poisoning, when defendant had murdered another wife and his mother by means of paraquat.

Defendant's insistence that there was no direct evidence that he possessed paraquat at the time of Joyce's death, or that he administered it to her, is misplaced. Circumstantial evidence may constitute substantial evidence of guilt. (See *People v. Kraft, supra,* 23 Cal.4th at p. 1053; *People v. Millwee* (1998) 18 Cal.4th 96, 132 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Bean* (1988) 46 Cal.3d 919, 932-933 [251 Cal.Rptr. 467, 760 P.2d 996].) A defendant's responsibility for administering poison most frequently must be proved circumstantially (see *People v Diaz, supra,* 3 Cal.4th at p. 530; *People v. Archerd, supra,* 3 Cal.3d at pp. 621, 638 [evidence that defendant had killed relatives by insulin poisoning was admissible to prove that he murdered other relatives by insulin poisoning]; *People v. Cuff* (1898) 122 Cal. 589, 591 [55 P. 407]), and in the case of the murder of a spouse, it is particularly likely that the evidence will be circumstantial. (See *People v. Ruiz, supra,* 44 Cal.3d at pp. 605-606 [the abrupt disappearance of defendant's third wife under suspicious circumstances indicating foul play would be admissible to establish the identity of the perpetrator of the murder of defendant's fifth wife, who disappeared under similar circumstances]; *People v. Helwinkel* (1962) 199 Cal.App.2d 207, 217-218 [18 Cal.Rptr. 685].)

▪ With respect to the murder of Martha, there was evidence that defendant had tired of caring for his mother, that she had expressed disapproval of his many marriages and had threatened to disinherit him, and that he had secured funds from her for the purpose of purchasing her a new residence but had not used the funds for that purpose. It was established by overwhelming evidence that she had received a toxic dose of paraquat. Other-crimes evidence also indicated that it was defendant who had administered the paraquat.

Defendant contends that inconsistencies between the testimony of the prosecution's experts at his Monterey County trial for the murder of Glenna and in the present case regarding the time at which the paraquat would have had to have been administered in order to produce the symptoms displayed by Martha, and to have caused her death at the time it occurred, demonstrate

that there was not substantial evidence that it was defendant who administered the poison.

Defendant was able to cross-examine the prosecution experts with respect to any inconsistencies in their testimony. Evidence admitted only at the prior trial is not before us. Inconsistent testimony by defendant's employee regarding defendant's presence or absence from Fresno during the week preceding his mother's death was fully explored at trial. The question whether he was present at work in Fresno during those days was not of the greatest significance, however, because Fresno and Bakersfield are less than two hours' drive apart, and defendant could have visited his mother, who lived alone, at various times during the week. The exact method of paraquat administration was not determinative—the poison could have been administered in many different ways, including by placing it in a medicine bottle, the contents of which Martha would administer to herself. Indeed, the poison could have been introduced into Martha's cough syrup on the Sunday preceding her murder, when defendant visited her.

Defendant claims that the sole evidence against him was his fingerprint on the bottle of paraquat found in his shop/garage, and that a fingerprint alone does not constitute sufficient evidence of guilt unless the prosecution proved beyond a reasonable doubt that defendant placed the fingerprint on the bottle at the time of the murders.

As our discussion above demonstrates, defendant is mistaken in his premise that the sole evidence against him was the fingerprint. The fingerprint evidence may have been equivocal in some respects, because defendant's fingerprint could have been placed on the bottle at any time, even after the crimes, and in any event the bottle was filled after Joyce's death, but these points were made to the jury by the defense. Moreover, the presence of the fingerprint was significant with respect to the issue of defendant's credibility, even without proof of the time at which the fingerprint had been applied, because defendant denied that he ever had possessed paraquat "that I have known of."

In sum, we conclude that there was credible evidence of solid value from which a reasonable jury could conclude beyond a reasonable doubt that defendant was guilty of the charged crimes.

13. *Prosecutorial misconduct: introduction of allegedly altered evidence*

Defendant contends that the testimony of Dr. Buteau, a prosecution expert witness at the Monterey County trial for the death of Glenna, was substantially different from the testimony of Dr. Ford, a prosecution expert witness

who testified at the trial in the present case. He complains that at the first trial and at the preliminary hearing in the present case, Dr. Buteau suggested that Glenna and Martha would have exhibited symptoms of paraquat poisoning within 12 to 24 hours of ingestion of paraquat.[15] Under facts developed by defendant in the present case, it would have been unlikely or less likely that defendant could have administered the poison if the 12- to 24-hour timeframe were accurate. At trial in the present case, Dr. Ford, another expert, testified that Martha's symptoms were consistent with an earlier administration of the poison, and Glenna's with a later administration of the poison—in each instance times at which defendant had the opportunity to administer the poison. Defendant claims that the prosecutor committed misconduct in violation of defendant's right to a fair trial by prosecuting the present case under a different theory and with different evidence than was presented at the earlier trial for the murder of Glenna.

To the extent defendant's claim is based upon inconsistencies between the testimony of Dr. Ford in the present case and that of Dr. Buteau at a different trial, those inconsistencies could be explored on cross-examination and through the presentation of defense evidence. In fact, Dr. Ford was cross-examined regarding these inconsistencies, and defendant called Dr. Buteau as a defense witness. With respect to the possibility that separate trials relating to the same crime improperly may have been tried under inconsistent theories, we examined a similar claim in *People v. Sakarias* (2000) 22 Cal.4th 596 [94 Cal.Rptr.2d 17, 995 P.2d 152]. ▮▮▮ In that case, we determined that a contention that inconsistent theories of prosecution give rise to a claim that the prosecution wrongfully has employed different theories at two separate trials best is examined in connection with a petition for writ of habeas corpus, where the record of the prior trial may be examined and the reasons for the discrepancies may be analyzed and explained. (*Id.* at pp. 635-636.) For the same reason, we determine that the issue is not appropriate for resolution on direct appeal in the present case.

14. *Instructional error*

a. *Other-crimes evidence—CALJIC No. 2.50*

Defendant contends the court erred in instructing the jury that it could consider other-crimes evidence in determining the cause of death in the charged crimes, particularly with respect to the murder of Joyce.

The trial court instructed the jury, regarding their evaluation of other-crimes evidence, according to a modified version of CALJIC No. 2.50. Over

---

[15]As noted above, the trial record in the Monterey County case is not part of the record on appeal in the present case.

defense objection, the trial court granted the prosecutor's request that the instruction be modified to state that other-crimes evidence may be considered not only for the purpose of establishing the identity of the person responsible for the charged offenses, but also for the purpose of determining the cause of death of the victims in the charged offenses.[16]

Defendant contends that he was "convicted of a capital offense on evidence which would not satisfy the reasonable doubt standard." In support, he claims that uncharged crimes evidence that he killed Glenna improperly was admitted in the present case. We already have determined that the evidence properly was admitted.

Defendant also contends that the court violated his right to a fair trial and to a reliable penalty determination by giving the modified version of CALJIC No. 2.50, because the modified instruction "lessened the prosecution's burden of proof on the crucial issue of cause of death." If defendant means that the prosecutor's burden of proof was lightened because the instruction entitled the jury to consider improperly admitted evidence of cause of death, it suffices to note that we already have rejected the contention that this evidence was admitted improperly.

■ Defendant's principal contention seems to be that other-crimes evidence may be admitted only for the purpose of proving intent, identity, motive, knowledge, and conspiracy. Cause of death, he claims, is not an appropriate object of proof for other-crimes evidence. Rather, he asserts, cause of death may be proved only by expert opinion testimony.

Evidence Code section 1101, subdivision (b), permits the admission of other-crimes evidence against a defendant "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." Section 1101 prohibits the admission of other-crimes evidence for the purpose of showing the defendant's bad character or criminal propensity. It recognizes, however, that there are facts other than criminal propensity to which other-crimes evidence may be relevant. (*People*

---

[16] The court instructed the jury: "Evidence has been introduced for the purpose of showing that the Defendant committed . . . crimes other than [those] for which he is on trial. Such evidence, if believed, was not received and may not be considered by you to prove that Defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show the cause of death of the victims in the crimes, if any[,] of which the Defendant is accused, the identity of the person who committed the crimes, if any[,] of which the Defendant is accused[. F]or the limited purpose of which you may consider such evidence you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

*v. Ewoldt, supra,* 7 Cal.4th at p. 393.) The categories listed in section 1101, subdivision (b), are examples of facts that legitimately may be proved by other-crimes evidence, but, contrary to defendant's contention, the list is not exclusive. (*People v. Key* (1984) 153 Cal.App.3d 888, 894 [203 Cal.Rptr. 144]; see also *People v. Thompson* (1980) 27 Cal.3d 303, 315, fn. 14 [165 Cal.Rptr. 289, 611 P.2d 883]; 1 Witkin, Cal. Evidence, *supra,* Circumstantial Evidence, § 75, p. 411.) As we have explained, the admissibility of other-crimes evidence depends upon the materiality of the fact sought to be proved or disproved, the tendency of the uncharged crime to prove or disprove the material fact, and the existence of any policy requiring exclusion of the evidence. (*People v. Thompson, supra,* 27 Cal.3d 303, 315.) In order to be material, the fact in dispute "may be either an ultimate fact in the proceeding or an intermediate fact 'from which such ultimate fact[] may be . . . inferred.' " (*Ibid.,* fn. omitted.)

Defendant's not guilty plea put in issue all the elements of the charged offenses. (*People v. Balcom* (1994) 7 Cal.4th 414, 422 [27 Cal.Rptr.2d 666, 867 P.2d 777].) Evidence tending to demonstrate the cause of death was relevant to demonstrate that a murder—and not a natural death—had occurred. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 171 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Scheid* (1997) 16 Cal.4th 1, 15 [65 Cal.Rptr.2d 348, 939 P.2d 748].) Evidence that defendant previously had murdered his wife Glenna by poisoning her with paraquat was relevant to the issue of the cause of death in the charged crimes, because it tended to corroborate the other evidence establishing that Joyce and Martha died of paraquat poisoning. (See *People v. Diaz, supra,* 3 Cal.4th at pp. 561-562; *People v. Ruiz, supra,* 44 Cal.3d at pp. 605-606; *People v. Montalvo* (1971) 4 Cal.3d 328, 332 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518] [evidence that defendant previously injected a young girl with heroin, causing certain reactions, was relevant to prove that in the charged crime, a substance that caused the same reactions when injected also was heroin].)

We are not persuaded by defendant's contention that the cause of death may be established only through expert opinion testimony and not through other-crimes evidence. Cases he cites in support declare only that expert opinion testimony on the question of cause of death also is admissible. (See *People v. Mayfield, supra,* 14 Cal.4th at p. 766; *People v. Cole* (1956) 47 Cal.2d 99, 103-104 [301 P.2d 854, 56 A.L.R.2d 1435].) Other evidence relevant to cause of death also is admissible. (See, e.g., *People v. Mendoza, supra,* 24 Cal.4th at p. 171; *People v. Scheid, supra,* 16 Cal.4th at p. 15; *People v. Diaz, supra,* 3 Cal.4th at pp. 561-562.)

Defendant complains that the instruction informed the jurors that in the event they found that Glenna died of paraquat poison, they could find from

that fact alone that both Joyce and Martha died of paraquat poison. We do not believe, however, that the instruction conveyed that impression. It directed the jury to consider "if" the other-crimes evidence "tends" to demonstrate cause of death and identity, and directed the jury to weigh the evidence in the same manner as it would weigh all other evidence in the case.

Defendant claims that the giving of the instruction violated his state and federal constitutional rights to due process of law and to a fair trial. He contends that by permitting the jury to convict him on the basis of evidence of his criminal propensity, the instruction relieved the prosecution of its full burden of proof on the issue of the cause of the victims' deaths. We have concluded already, however, that the instruction did not permit the jury to rely on evidence of defendant's criminal propensity, and that it did not direct that the jury could determine the cause of Joyce's and Martha's deaths solely from evidence establishing that the cause of Glenna's death was paraquat poisoning.

Defendant also complains that the modified instruction failed to explain exactly what type of other-crimes evidence could be considered. In support, he cites *People v. Rollo* (1977) 20 Cal.3d 109 [141 Cal.Rptr. 177, 569 P.2d 771]. In that case this court stated that when evidence of a prior conviction has been admitted for impeachment purposes and other-crimes evidence also has been admitted pursuant to Evidence Code section 1101, subdivision (b), the trial court should instruct the jury as to which evidence is referred to in the CALJIC No. 2.50 instruction, in order to avoid confusion. (*Rollo, supra,* 20 Cal.3d at p. 123, fn. 6.) In the present case, in addition to the other-crimes evidence, evidence that defendant had suffered a prior forgery conviction was admitted for impeachment purposes. Even if we consider this claim as invoking the federal Constitution, with its exacting standard of prejudice, we conclude that any error in failing to modify CALJIC No. 2.50 was harmless beyond a reasonable doubt. The jury was instructed that the evidence of a prior conviction could be considered only for the purpose of impeachment. We believe there is no reasonable possibility that the jury considered the prior forgery conviction in making its determinations, in accordance with CALJIC No. 2.50, on the issues of cause of death and the identity of the perpetrator. (See *Chapman v. California, supra,* 386 U.S. 18, 24 [87 S.Ct. 824, 828].)

b. *Malice instruction*

Defense counsel requested that the court delete reference to express malice in CALJIC No. 8.11. Apparently, defense counsel believed there was

no evidence of express malice, and the prosecutor, although he pointed to some potential evidence of express malice, concurred in the request to delete the reference in this instruction to express malice. Accordingly, a modified version of CALJIC No. 8.11 was read to the jury, as noted in the margin.[17]

The court also gave CALJIC No. 8.20, which began: "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with *express malice* aforethought is murder of the first degree." (Italics added.)[18]

Defendant complains that despite the agreement of the parties, the jury was instructed in CALJIC No. 8.20 that express malice aforethought was required to find murder in the first degree. "To reach a first degree murder verdict, jurors were instructed to make a determination about a concept left completely undefined by the court's instructions . . . . A reasonable juror would have been confused by this lapse. Due to this confusion, the jury could not have found first degree murder on the basis of premeditation and deliberation. For Joyce, in particular, for whom the prosecutor proceeded on a theory of premeditated and deliberate murder, based on the court's instructions, the jury could not properly have found appellant guilty of first degree murder." Defendant claims that confusion over elements of the charged

---

[17]The jury was instructed that "Every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder . . . ." Malice was defined as follows: "Malice is implied when the killing resulted from an intentional act, the natural consequences of the act are dangerous to human life and the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life. [¶] When it is shown that a killing resulted from the intentional doing of an act with implied malice, no other mental state needs to be shown to establish the mental state of malice aforethought. [¶] The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed. [¶] The word aforethought does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act."

[18]The instruction continued: "The word willful as used in these instructions means intentional. The word deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word premeditated means considered beforehand. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the Defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree. [¶] The law does not undertake to measure in units of time the length of [the] period in which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. [¶] The time will vary with different individuals and under different varying circumstances. [¶] The true test is not in the duration of time but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time but a mere unconsidered and rash impulse, even though it included an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and having in mind the consequences, he decides to and does kill."

offenses constituted a violation of his constitutional right to due process of law and that the asserted error also violated his constitutional right to a reliable penalty determination under the Eighth and Fourteenth Amendments to the United States Constitution.

As we understand defendant's contention, he claims that a jury that does not know the meaning of the term "express malice" could not properly have determined that defendant was guilty of first degree murder on a premeditated murder theory, because such a theory requires proof of express malice. Alternatively, defendant may mean that because there was no evidence of express malice, it was error not to delete the term express malice from CALJIC No. 8.20, and that the alleged error deprived defendant of the chance that the jury would find only implied malice.

It is difficult to understand why the prosecutor and the court agreed to omit the definition of express malice contained in CALJIC No. 8.11, because there was ample evidence of express malice. The prosecutor's agreement is particularly perplexing, because implied malice murder normally constitutes only murder in the second degree. (See *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102-104 [13 Cal.Rptr.2d 864, 840 P.2d 969].) We surmise that the prosecutor agreed with the proposal because for each count, the prosecution was attempting to prove murder by poison, which constitutes a first degree murder whether malice is express or implied. (See *People v. Diaz*, *supra*, 3 Cal.4th at p. 538; *People v. Mattison* (1971) 4 Cal.3d 177, 182-183 [93 Cal.Rptr. 185, 481 P.2d 193]; see also 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against the Person, § 130, p. 748 ["Killing by poison may be criminally negligent and amount only to manslaughter . . . or may be second degree felony-murder . . . . But killing with malice aforethought, when perpetrated by means of poison, is first degree murder"].)

To the extent defendant claims that the giving of CALJIC No. 8.20 without modification constituted error, we observe that defendant did not request a modification of this standard instruction, an instruction that was appropriate under the facts of this case. " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 [76 Cal.Rptr.2d 239, 957 P.2d 928]; see also *People v. Bolin* (1998) 18 Cal.4th 297, 328 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Alvarez*, *supra*, 14 Cal.4th at p. 223; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142 [36 Cal.Rptr.2d 235, 885 P.2d 1]; but see *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [instructional error affecting the defendant's substantial rights may be reviewed on appeal in the absence of an objection].)

To the extent defendant claims that the jury should have been instructed on express malice if they were to be instructed on premeditated murder, the Attorney General contends that any error was invited. It was defendant's proposal, with which the prosecutor somewhat reluctantly agreed, to omit the definition of express malice from CALJIC No. 8.11. ▮▮ When defense counsel makes a " 'conscious, deliberate tactical choice' " to request an instruction, any error in the giving of the instruction is invited and cannot be raised on appeal. (*People v. Wader, supra,* 5 Cal.4th at p. 657; see also *People v. Lucero* (2000) 23 Cal.4th 692, 723-724 [97 Cal.Rptr.2d 871, 3 P.3d 248].) Counsel's choice appears to have been deliberate.

Even if the claim is not barred, defendant's claim clearly is untenable on the merits. Defendant's premise that there was no evidence of express malice is faulty. The evidence was strong that defendant had formed an intent to kill Joyce, Glenna, and Martha unlawfully through the common scheme of administering paraquat. (See § 188; *People v. Swain* (1996) 12 Cal.4th 593, 601 [49 Cal.Rptr.2d 390, 909 P.2d 994].) Indeed, as noted below, the jury's special circumstance finding constituted an express determination that defendant possessed a deliberate intent to kill Martha unlawfully.

▮▮ Further, even if for some reason defendant was entitled to the removal of the term "express malice" from CALJIC No. 8.20, any error under California law was harmless (see *People v. Flood* (1998) 18 Cal.4th 470, 490 [76 Cal.Rptr.2d 180, 957 P.2d 869] [applying a standard posing the question whether there is a reasonable probability that the error affected the outcome, when instructional error under California law is found]), because defendant would be guilty of first degree murder whether the jury found express or implied malice. The evidence established as to each charge that if defendant committed murder, he committed it by means of poison. With respect to Martha, the jury specifically found that the murder was intentional, and that it was committed by means of poison, when it returned a true finding on the murder-by-poison special circumstance. The evidence was equally compelling that if defendant murdered Joyce, he did so by means of poison. As noted above, whether the jury found express or implied malice, as long as it found one or the other form of malice, the murders were in the first degree. As noted, all murder that is committed by means of poison is murder in the first degree. (*People v. Diaz, supra,* 3 Cal.4th at pp. 538, 568; *People v. Mattison, supra,* 4 Cal.3d at pp. 182-184; see also *People v. Cobler* (1934) 2 Cal.App.2d 375, 380 [37 P.2d 869]; 1 Witkin & Epstein, Cal. Criminal Law, *supra,* Crimes Against the Person, § 130, p. 748; *id.,* § 190, p. 800.) In fact, the question whether defendant acted with express or implied malice did not figure in either party's closing arguments to the jury.

Defendant complains that the jury was faced with determining whether express malice had been established without ever having received an instruction on express malice. This problem, of course, was caused by the request

on the part of defense counsel, with the concurrence of the prosecution, to delete the definition of express malice.

Considering the instructions as a whole, we do not find any reasonable likelihood that the omission would confuse the jury or relieve the prosecution of any of its burden of proof (*People v. Smithey, supra,* 20 Cal.4th at p. 981; see *People v. Castillo* (1997) 16 Cal.4th 1009, 1016 [68 Cal.Rptr.2d 648, 945 P.2d 1197]; *People v. Cain* (1995) 10 Cal.4th 1, 35-36 [40 Cal.Rptr.2d 481, 892 P.2d 1224]), because the instruction on premeditation adequately informed the jury of the state of mind required for first degree premeditated murder. As noted, "proof of unlawful 'intent to kill' is the functional equivalent of express malice" (*People v. Swain, supra,* 12 Cal.4th at p. 601), and the premeditation instruction included a requirement that the jury find a "killing . . . preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill." (CALJIC No. 8.20.) The jury would understand the requirements of express malice under the instructions as a whole.

Further, even assuming that the alleged error constituted an improper description of or an omission of an element of the offenses in violation of the federal Constitution, as defendant contends, any error was harmless beyond a reasonable doubt. (See *People v. Flood, supra,* 18 Cal.4th at pp. 490, 502-503 [harmless error ]; see also *People v. Cox* (2000) 23 Cal.4th 665, 676-677 & fn. 6 [97 Cal.Rptr.2d 647, 2 P.3d 1189] [harmless error]; *People v. Sakarias, supra,* 22 Cal.4th at p. 625 [same].) Even if the jury relied upon a premeditation theory of first degree murder rather than a murder-by-poison theory as to Joyce, it could not find premeditation and deliberation without determining that defendant had a state of mind constituting express malice. If the jury believed the prosecution had proved only implied malice, and that the prosecution had failed to prove that the murder was committed by means of poison, it is nonetheless significant that the jury was properly instructed on implied malice and was given a second degree murder instruction. That instruction directed that if the jury found only implied malice, it should return a verdict of second degree rather than first degree murder. It is clear beyond a reasonable doubt that any error did not contribute to the verdict.

 c. *Special instruction No. 8*

Defendant requested that the court instruct the jury as follows: "The prosecution has the burden of proving beyond a reasonable doubt that the cause of death of Joyce Catlin was paraquat poisoning. If the evidence introduced in this case relating to the cause of death of Joyce Catlin fails to prove beyond a reasonable doubt that the cause of death . . . was paraquat

poisoning, you must give Mr. Catlin the benefit of the doubt and find him not guilty of Count One." The prosecutor objected on the ground that the instruction was cumulative. He stated: "The jury is instructed that they have to find beyond a reasonable doubt that Mr. Catlin did intentional acts that resulted in the death of Joyce Catlin, and that's covered in the instructions defining murder and reasonable doubt." The trial court declined to give the instruction requested by defendant.

Defendant claims that the giving of the special instruction was imperative, because of the circumstance that most of the prosecution's evidence with respect to Joyce related to the issue of cause of death, and he points out that the court granted his request for a similar instruction with respect to the murder of Martha. He surmises that the asymmetry in instructions would cause the jury to believe a lesser level of proof was required to establish the cause of Joyce's death, thereby improperly relieving the prosecution of its full burden of proof. He points to the introduction of other-crimes evidence to establish the cause of Joyce's death, contending that in order to avoid a guilt determination on the basis of a finding of criminal propensity, it was particularly important to require that the cause of Joyce's death be proved beyond a reasonable doubt. Finally, he contends the instruction was necessary to clear up the confusion caused by the malice instructions discussed above.

The trial court properly could refuse the instruction on the ground that the point adequately was covered in the instructions related to the prosecution's burden of proof and the elements of murder, as well as in the instruction on proximate cause. (See *People v. Garceau* (1993) 6 Cal.4th 140, 192-193 [24 Cal.Rptr.2d 664, 862 P.2d 664] [the court may refuse a request for an instruction the point of which was covered adequately by the instruction requiring proof beyond a reasonable doubt].)

Defendant did not contend at trial that the instruction was necessary because a similar one was to be given with respect to the murder of Martha, or that the asymmetry in instructions as to the two murders would confuse the jury. Even assuming his claim was not waived, we do not believe that, viewing the instructions as a whole, it is reasonably likely (see *People v. Clair, supra*, 2 Cal.4th at p. 663) that the jury would be misled simply because it received a pinpoint instruction directing it to determine whether the cause of Martha's death was, beyond a reasonable doubt, paraquat poisoning, but did not receive a similar pinpoint instruction with respect to the death of Joyce. As noted above, in light of the instructions on proof beyond a reasonable doubt, on the elements of the crimes charged, and on proximate cause, the jury would not be misled as defendant claims, particularly because neither the defense nor the prosecution argued to the jury that

a different standard applied as between the two charged murders. It is not reasonably likely that under the instructions as a whole, jurors mistakenly would conclude that defendant could be convicted of the murder of Joyce even if they had a reasonable doubt that she might have died of natural causes, or that they would conclude that defendant could be convicted of the murder of Joyce on the basis of evidence of defendant's criminal propensity. The circumstance that causation was a major issue in the trial would not add to the risk that the jury would be misled with respect to the burden of proof. We have rejected the contention that the other-crimes evidence constituted evidence of criminal propensity, and observe that the jury properly was instructed on the limited purpose for which they could consider the evidence of other crimes. Finally, we do not believe the proposed instruction could have had any effect on the jury's understanding of the instructions on malice discussed above. In sum, the requested instruction was unnecessary, and the trial court did not err in refusing to give it.

### d. Special instruction No. 7

Defendant contends the trial court erred in refusing to give a proposed special instruction stating: "Evidence applicable to each offense charged must be considered as if it were the only accusation before the jury."

The court correctly refused to give the instruction. █ Contrary to the import of the proposed special instruction, under Evidence Code section 1101 the jury properly could consider other-crimes evidence in connection with each count, and also could consider evidence relevant to one of the charged counts as it considered the other charged count. (See *People v. Beagle* (1972) 6 Cal.3d 441, 456 [99 Cal.Rptr. 313, 492 P.2d 1], overruled on other grounds in *People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].) As explained above, evidence regarding the murder of Joyce would have been cross-admissible in a separate trial for the murder of Martha, and vice versa. To the extent that defendant requested the instruction in order to require the jury to arrive at a verdict on each count separately, his requested instruction was cumulative, because that purpose was served by the giving of the following rendition of CALJIC No. 17.02: "Each count charges a distinct crime. You must decide each count . . . separately. The Defendant may be found guilty or not guilty of either or both of the crimes charged. Your finding as to each count must be stated in a separate verdict." Defendant's claim of instructional error is unpersuasive.

### e. CALJIC No. 8.81.19

█ Section 190.2, subdivision (a)(19), defines the murder-by-poison special circumstance as a murder in which "[t]he defendant intentionally

killed the victim by the administration of poison." Defendant contends that in instructing the jury, the court omitted an essential element that defendant describes variously as a "specific intent to bring about a death by poison," or an "intent to administer poison," or an "intent to administer poison for the purpose of killing the victim." The instruction given, he claims, required only proof of intent to kill. The instruction omitted an essential element of the special circumstance allegation, he claims, in violation of the due process clause of the federal Constitution. Automatic reversal without regard to prejudice is required, according to defendant.

The trial court instructed the jury pursuant to CALJIC No. 8.81.19, with slight variations, as follows: "To find that the special circumstance[] referred to in these instructions as murder by administration of poison is true, each of the following elements must be proved: [¶] One, that the killing was intentional and two, the Defendant committed the murder by the administration of poison." It also instructed: "The word poison means any substance introduced into the body by any means which by its chemical action is capable of causing death. Paraquat is a poison."

As respondent contends, the instruction given by the court reasonably would be understood as requiring proof that the defendant administered poison with the intent to kill the victim. The instruction required proof that there was an intentional killing and that the defendant "committed the murder *by* the administration of poison." Read together in a commonsense fashion, a jury would understand from this language that proof is required that defendant administered the poison with the intent to kill the victim.

In any event, even if the instruction actually had omitted an element of the special circumstance charge (which, we reiterate, we have concluded was not the case), under the evidence presented in this case and the arguments of counsel, it is not reasonably possible that the jury could have found that defendant had the intent to kill Martha and that the murder occurred by means of poison, but that the defendant did not intend to use poison to kill Martha. Any error would be harmless beyond a reasonable doubt. (See *Neder v. United States* (1999) 527 U.S. 1, 9, 18 [119 S.Ct. 1827, 1833-1834, 1838, 144 L.Ed.2d 35] [applying harmless error standard to instructional error omitting an element of an offense]; *People v. Cox, supra*, 23 Cal.4th at pp. 676-677 & fn. 6.)

### f. *Proximate cause instructions*

Defendant contends that the jury instructions on proximate cause erroneously would have permitted conviction for the murder of Martha even if the jury believed that the principal cause of her death was a circulatory disease.

The court instructed the jury on the issue of proximate cause pursuant to modified versions of former CALJIC Nos. 8.55 and 8.58, as follows: "[¶] To constitute murder, there must be, in addition to the death of a human being, an unlawful act which was the proximate cause of that death. [¶] The proximate cause of a death is a cause which in natural and continuous sequence, produces the death and without which the death would not have occurred. [¶] In this case, the Prosecution has the burden of proving beyond a reasonable doubt that paraquat poisoning was a proximate cause of Martha Catlin's death. If the evidence in this case fails to prove beyond a reasonable doubt that paraquat poisoning was a proximate cause of Martha Catlin's death, Mr. Catlin is entitled to a verdict of not guilty as to Count II. [¶] If a person unlawfully inflicts a physical injury upon another person and that injury is a proximate cause of the latter's death, such conduct constitutes an unlawful homicide, even though the injury inflicted was not the only cause of the death. [¶] Moreover, that conduct constitutes unlawful homicide even if one, the person injured had been already weakened by disease, injury, physical condition or other cause. [¶] Two, it is probable that a person in sound physical condition injured in the same way would not have died from the injury and three, it's probable that the injury only hastened the death of the injured person and four, the injured person would have died soon thereafter from another cause or causes."

Defendant claims that these instructions misstated the law by permitting the jury to return a guilty verdict on a charge of murder if it found concurrent causes of death, even if the criminal act was not a principal cause of death. ▮ The law provides, however, that as long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death. Rather, it is required that the cause was a substantial factor contributing to the result: " '[N]o cause will receive judicial recognition if the part it played was so infinitesimal or so theoretical that it cannot properly be regarded as a *substantial factor* in bringing about the particular result.' " (*People v. Caldwell* (1984) 36 Cal.3d 210, 220 [203 Cal.Rptr. 433, 681 P.2d 274]; see also *In re M.S.* (1995) 10 Cal.4th 698, 719-720 [42 Cal.Rptr.2d 355, 896 P.2d 1365].)

This is true even if the victim's preexisting physical condition also was a substantial factor causing death. (*People v. Wattier* (1996) 51 Cal.App.4th 948, 953 [59 Cal.Rptr.2d 483].) "So long as a victim's predisposing physical condition, regardless of its cause, is not the *only* substantial factor bringing about his death, that condition . . . in no way destroys the [defendant's] criminal responsibility for the death." (*People v. Stamp* (1969) 2 Cal.App.3d 203, 210 [82 Cal.Rptr. 598]; see also *People v. Wattier, supra,* 51 Cal.App.4th

at p. 953; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1523 [28 Cal.Rptr.2d 758]; 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements, § 37, p. 243 ["A defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause"].)

Defendant also contends that the court should have given CALJIC No. 3.41, which states expressly that when there are concurrent causes of death, the defendant's conduct is a proximate cause of death "if that conduct was also a substantial factor contributing to the result."

Even if defendant is correct that the clarifying instruction should have been given, we do not believe it was reasonably probable that its omission affected the verdict. (See *People v. Flood, supra,* 18 Cal.4th at p. 490.) The evidence was overwhelming that Martha and Joyce died of paraquat poisoning and not from natural causes, and even as to Martha, who had some preexisting physical problems, the evidence was overwhelming that paraquat poisoning was at least a substantial factor in, *if not the sole cause of,* her death.

Defendant also complains that the instructions the court gave on causation subsequently were criticized by this court in *People v. Roberts* (1992) 2 Cal.4th 271, 311-313 [6 Cal.Rptr.2d 276, 826 P.2d 274]. He complains that under the instructions as given, "some jurors may have believed that [he] did an unlawful act which nevertheless did not bring about Martha's death; however, based on the instructions read, those jurors could have erroneously convicted [him] of a capital offense if they concluded Martha's death sequentially followed that act."

We do not believe that under the instructions given, requiring that defendant's act constitute a cause that "produces . . . death and without which the death would not have occurred," the jurors reasonably could have concluded that they could convict defendant of the murder of Martha if they believed defendant committed an unlawful act that did not bring about her death, but was only followed temporally by her death. The instructions made it clear that the prosecution had the burden of proving that defendant's administration of paraquat was a cause of Martha's death, not just that it occurred near the time of her death. In fact, as respondent points out, at defendant's request the jury also was instructed on attempted murder to cover just the eventuality posited by defendant here—an attempt to poison Martha that did not cause her death.

As for our criticism of the proximate cause instruction in *People v. Roberts, supra,* 2 Cal.4th 271, we acknowledged a concern previously

expressed in *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1050-1051 [1 Cal.Rptr.2d 913, 819 P.2d 872], in the context of another instruction, that the proximate cause instruction placed "undue emphasis on physical or temporal nearness." (*People v. Roberts, supra,* 2 Cal.4th at p. 313.) We had expressed the fear in *Mitchell v. Gonzales, supra,* 54 Cal.3d 1041, that the proximate cause instruction might cause jurors "to focus improperly on the cause that is spatially or temporally closest to the harm." (*Id.* at p. 1052.) But in the present case, as we also explained in *Roberts,* "any such confusion on the jury's part could only benefit defendant," because defendant's act was not necessarily close in time—or place—to the death of each victim. (*People v. Roberts, supra,* 2 Cal.4th at p. 313.)

*Roberts* also recognized that the instruction on proximate cause might be confusing simply because of its poor grammar and the uncertainty of the meaning of the term "proximate cause." (*People v. Roberts, supra,* 2 Cal.4th at p. 313.) We do not believe, however, that these ambiguities in the instruction could have caused a juror to conclude that defendant's act might be a proximate cause of either victim's death simply because it occurred near the time of the death or illness of the victim, even though that juror did not believe that defendant's act caused the death.

Defendant contends that the proximate cause instructions lightened the prosecutor's burden of proof because they "removed from the jury's consideration other factors concerning Martha's medical condition and treatment which should have been considered in the jury's determination of 'proximate cause.'" He claims a violation of his right to due process of law and to a reliable determination of guilt and penalty.

Defendant does not specify what "other factors" he believes the jury should have been permitted to consider. The instructions did not direct the jury to ignore evidence regarding Martha's poor health or her age. Rather, they asked the jury to determine whether defendant's administration of poison was a cause without which Martha would not have died. The instructions did not relieve the prosecution of any of its burden of proof.

Defendant claims that cumulatively, the instructional errors he has alleged violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Because we do not find any error of substance, we do not agree.

15. *Section 190.2, subdivision (a)(19)—the murder by poison special circumstance*

Defendant contends that section 190.2, subdivision (a)(19), setting forth the murder-by-poison special circumstance, violates the Eighth

Amendment of the United States Constitution. He contends that this special circumstance merely repeats the definition of first degree murder by poison, and that a special circumstance allegation that merely repeats the elements that render a homicide a first degree murder fails to narrow the class of persons eligible for the death penalty, in violation of the Eighth Amendment of the United States Constitution and *Zant v. Stephens* (1983) 462 U.S. 862, 877-878 [103 S.Ct. 2733, 2742-2743, 77 L.Ed.2d 235]. He relies upon cases from other jurisdictions in which courts have held that a felony-murder special circumstance that merely repeats the elements of a first degree felony murder fails adequately to narrow the class of persons eligible for the death penalty. Defendant also complains that there is no objective reason why murder by poison is so reprehensible as to be singled out for punishment by death.

■■■ "To comport with the requirements of the Eighth Amendment, the legislative definition of a state's capital punishment scheme that serves the requisite 'narrowing' function must 'circumscribe the class of persons eligible for the death penalty.' (*Zant v. Stephens, supra*, 462 U.S. 862, 878 [77 L.Ed.2d 235, 251].) Additionally, it must afford some objective basis for distinguishing a case in which the death penalty has been imposed from the many cases in which it has not. [Citation.] A legislative definition lacking 'some narrowing principle' to limit the class of persons eligible for the death penalty and having no objective basis for appellate review is deemed to be impermissibly vague under the Eighth Amendment." (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 465 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

■■■ Defendant's contentions are flawed in several respects. First, it is not the case that the elements of the murder-by-poison special circumstance merely repeat the elements that render a homicide a first degree murder when committed by means of poison. The special circumstance allegation, unlike the definition of first degree murder by poison, requires proof that the defendant intentionally killed the victim. For the purpose of a first degree murder conviction based upon an unlawful killing by means of poison, proof of implied malice would suffice, as we have discussed above. (See *People v. Diaz, supra*, 3 Cal.4th at p. 568.)

Second, we have determined that first degree murder liability and special circumstance findings may be based upon common elements without offending the Eighth Amendment. (*People v. Marshall* (1990) 50 Cal.3d 907, 945-946 [269 Cal.Rptr. 269, 790 P.2d 676]; see also *People v. Wader, supra*, 5 Cal.4th at p. 669; *Lowenfield v. Phelps* (1988) 484 U.S. 231, 241-246 [108 S.Ct. 546, 552-555, 98 L.Ed.2d 568].) We observe that in asking us to reconsider our numerous decisions, defendant relies in part upon authority

that since has been overruled (see *Collins v. Lockart* (8th Cir. 1985) 754 F.2d 258, overruled in *Perry v. Lockhart* (8th Cir. 1989) 871 F.2d 1384, 1393; see also *Lockhart v. Fretwell* (1993) 506 U.S. 364, 371 [113 S.Ct. 838, 843-844, 122 L.Ed.2d 180]), and on authority from states in which the death penalty statute does not provide the narrowing function of special circumstance findings at the guilt phase, as well as on authority based upon independent state grounds. (See *State v. Bigbee* (Tenn. 1994) 885 S.W.2d 797, 816; *State v. Howell* (Tenn. 1993) 868 S.W.2d 238, 259, fn. 7.)

Third, we have determined that special circumstances involved in types of murders that occur with more frequency than murders by poison—such as lying in wait or felony murder—adequately narrow the class of persons eligible for the death penalty. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1023 [254 Cal.Rptr. 586, 766 P.2d 1] [lying in wait]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306] [felony murder]; see also *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1266 [74 Cal.Rptr.2d 212, 954 P.2d 475] [same].) Murder by means of poison, to judge by the reported cases discussing that type of murder, is a relatively rare crime, and the existence of the special circumstance of murder by poison does not have the potential of sweeping into the death-eligible category most persons who commit first degree murder.

Finally, defendant's claim that murder by poison is not particularly reprehensible as a type of first degree murder is unpersuasive. The poisoner acts surreptitiously, thus avoiding detection and defeating any chance at self-defense, and often betrays the most intimate trust. (See 4 Blackstone, Commentaries 196 ["Of all species of deaths the most detestable is that of poison; because it can of all others be the least prevented either by manhood or forethought . . . . And, therefore, . . . it was made treason . . . ."].)

16. *Failure to preserve evidence*

Defendant contends that the failure of the state to preserve the letter from the Bethesda Naval Hospital and to preserve the jar of Joyce's tissue constituted a violation of his right to due process of law under the state and federal Constitutions.

"Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence 'that might be expected to play a significant role in the suspect's defense.' (*California v. Trombetta* (1984) 467 U.S. 479, 488 [104 S.Ct. 2528, 2534, 81 L.Ed.2d 413]; accord, *People v. Beeler* (1995) 9 Cal.4th 953, 976 [39 Cal.Rptr.2d 607, 891 P.2d 153].) To fall within the scope of this duty, the evidence 'must both

possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' (*California* v. *Trombetta*, *supra*, 467 U.S. at p. 489 [104 S.Ct. at p. 2534]; *People* v. *Beeler*, *supra*, 9 Cal.4th at p. 976.) The state's responsibility is further limited when the defendant's challenge is to 'the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' (*Arizona* v. *Youngblood* (1988) 488 U.S. 51, 57 [109 S.Ct. 333, 337, 102 L.Ed.2d 281].) In such case, 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' (*Id.* at p. 58 [109 S.Ct. at p. 337]; accord, *People* v. *Beeler*, *supra*, 9 Cal.4th at p. 976.)" (*People* v. *Roybal* (1998) 19 Cal.4th 481, 509-510 [79 Cal.Rptr.2d 487, 966 P.2d 521].)

We already have concluded that the evidence in question was of minimal value to the defense. We do not believe that this evidence had any significant exculpatory value that would have been evident before the evidence was lost or destroyed. The letter stated that the tissue sample bore characteristics consistent with paraquat poisoning, and the authorities were informed—apparently correctly—that the jar of tissue was without evidentiary value, because it had been preserved improperly. In addition, defendant did not present any evidence suggesting that there was any bad faith in connection with the loss of the letter or the destruction of the tissue samples. The evidence reflected that the tissue had been retained beyond the usual period required by coroner's office policy, but ultimately that it was discarded when a new coroner took office "not knowing the ramifications of it."

### 17. *Public trial*

"Every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial which is open to the general public at all times." (*People* v. *Woodward* (1992) 4 Cal.4th 376, 382 [14 Cal.Rptr.2d 434, 841 P.2d 954]; see also *NBC Subsidiary (KNBC-TV), Inc.* v. *Superior Court* (1999) 20 Cal.4th 1178, 1213-1215 [86 Cal.Rptr.2d 778, 980 P.2d 337] [discussing applicability of right of public access to proceedings at which the jury is not present]; *id.*, at p. 1205 [First Amendment and Sixth Amendment rules are coextensive].)

▮ Defendant contends he was denied his state and federal constitutional right to a public trial, because on 15 occasions during the trial the judge cleared the courtroom of spectators. He also contends that the court

violated section 686, subdivision 1, which provides that the defendant in a criminal case is entitled to a public and speedy trial.

On each occasion upon which spectators were asked to leave the courtroom, defendant and defense counsel remained, and a transcript of the proceedings was made and kept without being placed under seal. It appears that the trial court several times cleared the courtroom of spectators when it properly asked the jury to leave the room. For example, on two occasions when a prosecution witness was testifying and appeared to be volunteering information, the court asked the jury and spectators to leave the courtroom. The court then discussed the problem of controlling the witness, and admonished the witness or established the scope of questions that would be permitted. On another occasion, when defense counsel requested a hearing outside the presence of the jury in order to make a motion to strike the testimony of a witness, the court cleared the courtroom of jurors and spectators alike. When the prosecutor requested a hearing outside the presence of the jury regarding the proposed testimony of witnesses, the court cleared the courtroom. The court also cleared the courtroom to discuss the merits of two defense evidentiary objections and several prosecution evidentiary objections. On one occasion the court cleared the courtroom and determined that because a prosecution witness was unable to identify defendant, she would not be permitted to testify further. Defense counsel, the prosecutor, and the court discussed the scope of the anticipated testimony of two prosecution witnesses outside the presence of the jury and spectators, reaching an agreement as to the scope of the testimony in some respects and permitting the court to rule on evidentiary objections made by the defense. The court cleared the courtroom to discuss the prosecutor's claim that defense cross-examination of a prosecution expert regarding the time at which he had formed his opinion was intended to suggest that the prosecutor had tampered with the witness, thereby giving the prosecutor the right to rebut the claim by reference to the prior trial of defendant. There also was one occasion on which the court cleared the courtroom to discuss the scheduling of testimony of several witnesses.

At trial, defendant did not object that these proceedings violated his right to a public trial. Failure to object in these circumstances constitutes a waiver of the claim on appeal. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1046-1047 [60 Cal.Rptr.2d 225, 929 P.2d 544], and cases cited; see also *Peretz v. United States* (1991) 501 U.S. 923, 936 [111 S.Ct. 2661, 2669, 115 L.Ed.2d 808] [noting that many basic rights are subject to waiver or forfeiture, including the right to a public trial]; *Levine v. United States* (1960) 362 U.S. 610, 619 [80 S.Ct. 1038, 1044, 4 L.Ed.2d 989] [failure to request a public proceeding at the conclusion of properly closed proceedings constitutes a

waiver of the claim, at least when defense counsel is present and there is not "the kind of secrecy that deprived petitioner of effective legal assistance and rendered irrelevant his failure to insist upon the claim he now makes"].) We previously have declined to reconsider our holdings in this respect (*People v. Bradford, supra*, 14 Cal.4th at pp. 1046-1047), and we are not persuaded that we should do so by defendant's general contention that "under certain circumstances constitutional issues can be raised for the first time on appeal," or by his contention that different rules should apply in capital cases.

### 18. *Violation of recusal order*

Defendant speculates that an investigator in the Kern County District Attorney's Office passed confidential information to the deputy attorney general who prosecuted the case, despite an order recusing the Kern County District Attorney's Office from prosecuting the case. Defendant is unable to provide evidence in the record indicating that any such conduct took place. On the contrary, the deputy attorney general who prosecuted the case stated on the record that the former deputy district attorney whose prior contact with defendant necessitated the recusal order never had disclosed confidential information to the investigator, and that neither the former deputy district attorney nor the investigator had disclosed confidential information to the deputy attorney general who prosecuted the case. Defendant counters that the recusal order required the recusal of the *entire* Kern County District Attorney's Office, and that this order was affirmed by the Court of Appeal. Defendant claims that contrary to the order, the deputy attorney general continued to use the resources of the Kern County District Attorney's Office, including the services of Newport, an investigator who previously had worked for Felice, the deputy district attorney whose contact with defendant necessitated the recusal order.

As respondent points out, however, defendant abandoned this claim at the trial level, never asking the court, which had declined to rule before submission of points and authorities, for a ruling on the motion and never filing the points and authorities requested by the trial court. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 931 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People v. Kaurish* (1990) 52 Cal.3d 648, 680 [276 Cal.Rptr. 788, 802 P.2d 278].)

### 19. *Ineffective assistance of counsel*

Defendant alleges that trial counsel provided ineffective assistance in various respects, in violation of his state and federal constitutional right to the effective assistance of counsel. ■■■ "To prevail on such claims, he must establish not only deficient performance, i.e., representation below an

objective standard of reasonableness, but also resultant prejudice. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decision-making must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' [Citation]. Finally, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Bolin, supra,* 18 Cal.4th at p. 333.)

a. *Failure to move to suppress evidence seized after a warrantless search*

Defendant contends that his trial counsel should have moved to suppress the bottle of paraquat discovered by Mr. Emery, Glenna's father, who conducted a search at the request of the police. It is evident that such a motion would have been without merit. Mr. Emery discovered the paraquat in a cabinet in the garage or shop in which Mr. Emery and defendant had conducted their businesses. The search, even assuming Mr. Emery should be considered to have acted as an agent of the police, was consensual. (*People v. Jenkins, supra,* 22 Cal.4th at p. 976 ["it is settled that 'the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared' "].) Although Emery stated that he predominantly used one side of the garage/shop, the evidence established that Emery and defendant had common authority over the entire garage, including the cabinet. Defense counsel was not required to make a meritless motion.

b. *Motion for separate juries*

Defendant contends trial counsel provided ineffective assistance in failing to renew the motion he had made before trial for separate juries. We have determined above, however, that in his initial motion for separate juries, counsel did not demonstrate good cause for separate guilt and penalty phase juries. Defendant does not point to other claims or record evidence not cited by counsel in his original motion that would have supplied good cause for separate juries. Defendant's contention that had the court empanelled separate juries, the penalty phase jury would not have heard any details regarding the murder of Glenna, but would have been presented only with the record of defendant's conviction for that crime, is inconsistent with settled case law.

(*People v. Stanley* (1995) 10 Cal.4th 764, 818 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People v. Zapien* (1993) 4 Cal.4th 929, 986-987 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *People v. Kelly* (1992) 1 Cal.4th 495, 550 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

Defendant claims that counsel should have argued on a renewed motion that, because he no longer intended to present evidence of defendant's psychological condition, a new jury should be empanelled that was untainted by his voir dire questions on attitudes toward such testimony. As an example, defendant points to an instance in which defense counsel asked a prospective juror (who did not serve on the jury) about his attitude concerning evidence of an accused's psychological status—having preceded the questioning with the statement that he was not talking about the evidence in this case, but was exploring the prospective juror's attitudes. Such questioning would not suggest a promise to introduce psychological evidence at the penalty phase, nor does defendant cite record evidence to support his claim that defense counsel changed his mind about defense strategy between the time he made the motion for separate juries and the time the penalty phase commenced. In any event, as we have stated above, counsel's general desire to voir dire one way for the guilt phase and another way for the penalty phase does not constitute good cause for empanelling separate juries.

### c. *Mention of prior trials*

During cross-examination by defense counsel, two witnesses volunteered a reference to prior trials. Seeking to suggest flaws in the chain of custody, defense counsel asked histotechnician Ruby Torres whether, at any time between 1976 and 1985, she had seen tissue blocks that had been gathered from Joyce during the autopsy, and the witness volunteered that she had seen them "once before in Fresno when I was in the trial there." Defense counsel asked the witness to clarify that she was referring to a preliminary hearing. In another instance, defense counsel was attempting to impeach Dr. Kilburn with prior statements regarding the cause of Joyce's death that the witness had made under oath at a prior "hearing." (Apparently the preliminary hearing in this case.) Dr. Kilburn explained that he had received additional expert opinion evidence subsequent to the autopsy and also that he had learned of defendant's connection with the paraquat murders of two other women. Defense counsel asked who had told the witness of defendant's connection with those murders, and the witness stated: "Well, it came out in a previous trial for the death of Glenna and Martha Catlin that I was a participant in Monterey." Counsel stated that this was not the import of his question, but that he was asking whether anyone outside the courtroom had explained the police investigation of the other crimes to the witness, and

whether this explanation had affected the witness's opinion regarding the cause of Joyce's death.

In a third instance, under direct examination by defense counsel, investigator Johansen was asked questions relating to informant Hardin's refusal to answer a defense investigator's questions. The questions evidently were intended to attack the credibility of the informant. The prosecutor asked further questions regarding the time of the meeting between the informant and the investigator, and elicited testimony that when the two met, the informant already had testified under oath and had answered questions by defense counsel. On redirect examination, defense counsel asked whether the officer remembered whether informant Hardin had met the defense investigator on November 18, 1985. When the witness expressed uncertainty, defense counsel asked "whether Hardin had testified in court before at any hearing before November 19 of 1985?" The witness responded: "I don't remember what the trial dates were."

Defendant contends that defense counsel provided ineffective assistance in failing to move to strike the testimony referring to a prior trial and to seek an admonition of the jury.

On several occasions during trial, witnesses properly were asked questions regarding their prior testimony. On most occasions, the prior testimony was referred to not as trial testimony but as testimony in a "prior proceeding," a "prior hearing," or a "prior appearance." The jury was aware, as a general matter, that there had been previous proceedings, but every effort was made not to disclose the fact that defendant previously had been convicted of the murder of Glenna. We do not believe that the comments defendant now complains of would have disclosed to the jury that defendant previously had been convicted of murder in connection with the death of Glenna. In any event, the decision whether to object, move to strike, or seek admonition regarding such testimony is highly tactical, and depends upon counsel's evaluation of the gravity of the problem and whether objection or other responses would serve only to highlight the undesirable testimony. (See *People v. Williams* (1997) 16 Cal.4th 153, 215 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Bradford, supra,* 14 Cal.4th at p. 1052.) On this record, we cannot conclude that counsel's inaction could not have had any legitimate tactical basis. (See *People v. Lucas, supra,* 12 Cal.4th at p. 437.)

d. *Failure to object to exclusion of spectators*

Defendant contends that trial counsel's failure to object to the exclusion of the public at various points during the trial constituted ineffective assistance

of counsel. Defendant's pro forma contention fails to address possible tactical considerations or the potentially legitimate contention that the brief closures were too trivial to constitute a violation of defendant's basic public trial right. (See *People v. Woodward, supra,* 4 Cal.4th at pp. 383-385, and cases cited; see also *Bowden v. Keane* (2d Cir. 2001) 237 F.3d 125, 128-129; *Gonzalez v. Quinones* (2d Cir. 2000) 211 F.3d 735, 737-738; *Peterson v. Williams* (2d Cir. 1996) 85 F.3d 39, 40-41; *Girtman v. Lockhart* (8th Cir. 1991) 942 F.2d 468, 471-472.) In addition, because the contention is that defendant's right to the effective assistance of counsel was violated, defendant is obliged to demonstrate prejudice, an obligation he fails to address. We reject defendant's claim.

 e. *CALJIC No. 8.58*

Defendant contends that trial counsel provided ineffective assistance in failing to object to the giving of CALJIC No. 8.58. We have determined, however, that the giving of the instruction was not error.

 f. *Failure to press for a ruling on the recusal issue*

Defendant claims that his attorney's failure to press for a ruling on the issue of the alleged violation of the order recusing the Kern County District Attorney's Office constituted ineffective assistance of counsel. This contention must fail in the absence of any evidence suggesting prejudice.

 g. *Cumulative effect*

Defendant contends that the cumulative effect of the above instances of asserted incompetence of defense counsel establishes prejudice. We disagree on the basis of the record before us.

 20. *Adequacy of record on appeal*

Defendant contends that the record on appeal is inadequate in various respects.

 ■ "A criminal defendant is indeed entitled to a record on appeal that is adequate to permit meaningful review. That is true under California law. [Citation.] It is true as well under the United States Constitution—under the Fourteenth Amendment generally, and under the Eighth Amendment specifically when a sentence of death is involved. [Citation.] The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort." (*People v. Alvarez, supra,* 14

Cal.4th at p. 196, fn. 8.) We also have explained that "[u]nder the Fourteenth Amendment, the record of the proceedings must be sufficient to permit adequate and effective appellate review. [Citations.] Under the Eighth Amendment, the record must be sufficient to ensure that there is no substantial risk the death sentence has been arbitrarily imposed." (*People v. Howard* (1992) 1 Cal.4th 1132, 1166 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

Defendant complains of four omissions in the record. First, he claims that a note sent by the jury to the court during deliberations is not in the record, and he contends that the court's response to the note also is missing. During a proceeding to settle the record, however, the court determined, based upon the testimony of the court reporter who had reported the proceedings and who referred to her journal, that the note had contained a request received on May 30, 1990, that testimony of Dr. Stephens be read back to the jury, and that on May 31, 1990, the reporter had read back the witness's entire testimony. Contrary to defendant's claim, the record on appeal supports this conclusion. It reflects that the court received a note from the jury on May 30, 1990, and responded, "we will read that to you in the morning." The following morning, the court stated at the outset of the proceedings: "We have a note from the jury foreman . . . asking for the transcript of Dr. Boyd Stephens's testimony on Joyce Catlin, and I propose to have the reporter read from the transcript." The prosecutor and defense counsel indicated that they agreed that the reporter could read from the transcript. After some discussion about what portion of the testimony would be read, the court determined that the reporter should read the testimony in its entirety. The transcript states that "the transcript of Boyd Stephens's testimony was read." Defendant's claim that there was a second missing note received on May 31, 1990, *after* Dr. Stephens's testimony had been read, and that further testimony was read on June 1, 1990, apparently is based upon a typographical mistake in the reporter's transcript as to the date the note was received—a mistake that has been corrected in the record and that, upon examination of the surrounding portion of the reporter's transcript, appears obviously to be merely typographical. The clerk's transcript confirms that the note from the jury regarding Dr. Stephens's testimony was received on May 30, 1990. It does not contain any reference to a subsequent note or to a reading of testimony on June 1, 1990. The record clearly is adequate for appellate review.

Defendant also complains of omissions in the record of the hearing on his recusal motion. On August 23 and 24, 1988, the trial court conducted a hearing on defendant's motion to recuse the Kern County District Attorney's Office. In connection with the hearing, Deputy District Attorney Baird, who then was prosecuting the case, testified on the second day of the hearing in

support of the district attorney's opposition to the recusal motion. After an in camera hearing from which Baird was excluded, the court denied the recusal motion, ordering merely that Baird not be supervised by Felice, the attorney then in the district attorney's office who previously had represented defendant, and that Newport, the investigator then working on the case, also not work with Felice. Subsequently, when these conditions proved impracticable, the entire Kern County District Attorney's Office was recused.

Defendant complains that the reporter's notes of Baird's testimony were destroyed, so that no record survives of the content of his testimony.

The motion under consideration on the date in question was defendant's motion to recuse the entire Kern County District Attorney's Office. Ultimately, defendant prevailed on that motion. Defendant does not contend on appeal that it was error to recuse the district attorney's office. Therefore, it seems highly unlikely that he could have been prejudiced by the destruction of the reporter's notes of Baird's testimony regarding the recusal. In any event, as respondent notes, the record of the remainder of the proceedings with respect to the recusal motion has survived, including testimony of Felice and Newport and the arguments of counsel. We note also that in his written opposition to the recusal motion, Baird discussed his very limited contact with Felice and denied discussing the case or receiving any confidential material from Felice. Defendant's claim that the absence of Baird's testimony undermined his ability to demonstrate that the deputy attorney general who prosecuted the case was tainted by his contact with the Kern County District Attorney's Office is not persuasive under the circumstances, particularly because defendant offers only speculation that Baird may have testified in a manner that would have supported this claim. Furthermore, the claim was abandoned at the trial level and is waived on appeal. Accordingly, we believe that the record on appeal is adequate for our review.

Defendant next complains that several discussions between the magistrate and counsel during the preliminary hearing were unreported. After a hearing, however, a settled statement was prepared establishing that the discussions were unrelated to the present case. Defendant does not suggest how unrelated discussions, particularly at the preliminary hearing stage, could be the basis for any claim on appeal. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 820-821 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 522 [165 Cal.Rptr. 851, 612 P.2d 941].) Defendant also fails to offer any persuasive reason why this court should not credit the recollection of the magistrate that the discussions were unrelated to this case —particularly because trial counsel participated in the hearing and did not disagree—or require that the magistrate specify the subject matter of the

unrelated discussions. (See *People v. Freeman* (1994) 8 Cal.4th 450, 510 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].)

Defendant also complains that the record lacks a reporter's transcript of a pretrial hearing at which the parties presented argument on defendant's motion to dismiss for delay in prosecution. The reporter stated that her notes from the hearing had been lost. After conferring with defendant's trial counsel and the prosecutor, the trial court prepared a settled statement, asserting that at the hearing, defense counsel and the prosecutor had repeated the contentions contained in their points and authorities (items that are in the record) on the motion to dismiss. The trial court also stated that the court and counsel had no recollection whether any testimony was given or whether documentary evidence was introduced at the hearing, but observed that the clerk's minute order does not reflect that testimony was presented or evidence was admitted. The settled statement relates: "Custom and practice of court clerks at that time dictated that, if such occurred, they be reflected in the Minute Order."

Defendant claims that the missing transcript might have contained Baird's testimony regarding an investigator with the Kern County Coroner's Office who, as other witnesses stated, had approached various experts in the late 1970's regarding Joyce's tissue samples and had been told they could not be analyzed for paraquat. Defendant also claims that the missing transcript might have noted the prosecutor's production of a letter from the Bethesda Naval Hospital indicating that the hospital's records did not contain any indication of work having been done on the case for Kern County.

There is no indication, other than speculation offered by defendant, that even if (contrary to the suggestion of the clerk's transcript) the missing transcript did contain the claimed testimony and a reference to the introduction of the letter, this evidence—which defendant assumes would have been offered by the prosecution—would have assisted defendant in establishing either prejudice arising from delay in prosecution, or lack of justification for the delay. This court has before it the testimony of all the witnesses called by the defense in support of its motion to dismiss and the testimony of one prosecution witness, as well as the related points and authorities filed by both sides. Under the circumstances, the record is adequate for our review of defendant's claim of delay in prosecution.[19] Defendant seems to contend that the missing transcript also might have contained generally exculpatory

---

[19]Because we reach this conclusion, we need not consider defendant's claim that the trial court should have permitted defendant's appellate counsel to participate in the trial court's record settlement conference with defendant's trial counsel and the prosecutor, held in connection with the motion to settle the record.

evidence, and thereby might have supported other claims on appeal, or at least have been of assistance to appellate counsel in determining which claims to raise. Again, this claim is speculative and does not satisfy defendant's obligation to establish that omissions in the record are prejudicial to his ability to prosecute his appeal.

Defendant also claims that this court's refusal to augment the record in the present case to include the record of his trial in Monterey County or to take judicial notice of the record of that trial has deprived him of a record adequate to prosecute the present appeal. He claims that the omission of this record has deprived him of adequate appellate review, effective assistance of counsel on appeal, and a complete review of his capital sentence, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

Normally, the transcripts of a prior trial would be irrelevant to an appeal from a judgment in a prosecution for different crimes, except to the extent excerpts from the earlier proceeding may have been introduced in the trial, whether for impeachment or some other purpose, or may have been relied upon by the trial court in ruling on a motion. Such excerpts already would be part of the normal record on appeal, and defendant does not contend they are missing from this record. The trial court in the present case was presented with evidence, for example, that in the prior trial for the murder of Glenna, the trial court in that case had determined that insufficient evidence supported the financial-gain special-circumstance allegation, but the trial court below concluded that such determination did not bar introduction of testimony in the present case that suggested a potential financial motive for the murder of Glenna.

The evidence before the trial court in the prior case—as opposed to that court's finding that there was insufficient evidence to support a true finding on the financial-gain special-circumstance allegation—was not before the court that tried the present case, nor was it relevant to the trial court's determination that the order relating to the special circumstance allegation in the prior case did not, under the collateral estoppel doctrine, bar admission of evidence in the present prosecution that the murder was committed for financial gain. The circumstance that witnesses may have testified differently at an earlier proceeding, or that a different court evaluating the particular evidence before it found certain evidence inadmissible or certain charges unsupported by sufficient evidence, does not suggest that the record of the previous proceeding must be included in the present appeal from conviction of different crimes when the trial court and the trier of fact in this proceeding did not consider or rely upon such evidence from the earlier

proceeding. (See *People v. Peevy* (1998) 17 Cal.4th 1184, 1207-1208 & fn. 4 [73 Cal.Rptr.2d 865, 953 P.2d 1212] [appellate courts generally do not take judicial notice of matter not presented to and considered by the trial court]; *People v. Jones, supra,* 15 Cal.4th at p. 171, fn. 17 [the record on appeal should not be augmented to include " 'material that was not a proper part of the record in the trial court' "]; *People v. Sanchez* (1995) 12 Cal.4th 1, 59, fn. 5 [47 Cal.Rptr.2d 843, 906 P.2d 1129] [refusing to take judicial notice of the record of a subsequent prosecution of an asserted coperpetrator to demonstrate an assertedly inconsistent prosecutorial position taken in the subsequent prosecution]; *People v. Rowland, supra,* 4 Cal.4th at p. 268, fn. 6 [refusing to take judicial notice of irrelevant matter]; *People v. Bean, supra,* 46 Cal.3d at p. 944 ["The scope of an appeal is limited to the record of the proceedings below"].)

As we stated in connection with a claim that the transcript of the trial of a coperpetrator should be included in the record on appeal from a capital conviction on the ground that the prosecutor proffered conflicting theories of guilt to the juries in each case, "any due process claim defendant can state should be 'presented by petition for writ of habeas corpus rather than by appeal.' [Citation.] [¶] The transcripts of [the coperpetrator's] trial are, of course, physically available to us, and notice of their contents would be permissible under Evidence Code sections 452 and 459. [Citation.] But we would be unable to take notice of any factual explanation the trial prosecutor may have for any material inconsistencies we might find by comparing the transcripts of the two trials Nor could we take notice of other extra-record evidence of the prosecutor's state of mind. . . . Defendant's claim is based on the existence of contrary testimony and argument in the earlier . . . trial [of the coperpetrator], of which we could take notice. If we did so, however, we would still be unable to determine whether, in the period between the two trials, significant new evidence surfaced on this point . . . , the medical examiner reevaluated his opinion, or other events occurred such that the prosecutor, at the time of defendant's trial, neither knew nor had reason to know his argument was false. . . . [¶] ▮ In short, this is an instance of the general rule that an appellate court should not take notice of matters not first presented to and considered by the trial court, where to do so would unfairly permit 'one side to press an issue or theory on appeal that was not raised below.' [Citation.]" (*People v. Sakarias, supra,* 22 Cal.4th at pp. 635-636.) Defendant's contention that the record of the earlier proceeding should have been made part of the appellate record because it may be relevant to his petition for writ of habeas corpus is unconvincing; he may make a request for judicial notice in connection with that separate proceeding.

## B. *Penalty phase issues*

### 1. *Prior violent criminal activity*

Defendant contends that the introduction, at the penalty phase, of evidence of his assault on his first wife "violated due process and the Fifth, Sixth, Eighth and Fourteenth Amendments." He contends that the incident, which occurred between 1964 and 1966, was too remote in time to be relevant and that the only evidence came from a biased witness—the victim. He claims that because the evidence was weak, the jury should not have been permitted to rely upon it. He adds that the jury may have placed too much reliance upon the incident because, at the penalty phase, they were not reinstructed concerning the credibility of a single witness.

This claim is waived because defendant failed to object at trial. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1188 [9 Cal.Rptr.2d 834, 832 P.2d 146].) In any event, defendant's contentions lack merit. The remoteness of the incident goes to its weight, not to its admissibility. (*People v. Anderson* (1990) 52 Cal.3d 453, 476 [276 Cal.Rptr. 356, 801 P.2d 1107]; see also *People v. Williams, supra,* 16 Cal.4th at p. 233 [rejecting constitutional and statutory claims against the admission of penalty phase evidence of prior criminal activity that could not be prosecuted because of a statute of limitations]; *People v. Rodrigues, supra,* 8 Cal.4th at p. 1161 [rejecting various constitutional claims regarding the admission of evidence of an assertedly remote prior offense].) Similarly, it was for the jury to consider whether the witness was too biased to be credible, and the jury was instructed to consider instructions that were given at the guilt phase that were relevant (which included those concerning the credibility of witnesses).

### 2. *Refusal of pinpoint instruction*

Defendant proffered the following pinpoint instruction, rejected by the trial court, on the factors that the jury could consider in mitigation:

"These [mitigating] aspects of the Defendant include, but are not limited to the following:

"(1) whether the Defendant was a helpful and caring man in his relationships with his friends and business associates;

"(2) whether the Defendant, by his actions, saved the life of another human being;

"(3) the Defendant's ability to engender feelings of love and/or respect for him by his friends, fellow inmates, prison staff and correctional officers;

"(4) whether the Defendant has positively adjusted to the type of structured and institutionalized environment in which he will live the rest of his life if given a sentence of life in prison without the possibility of parole;

"(5) whether Defendant has made positive contributions to the prison environment in which he now lives and whether he will continue to make such contributions if he serves a sentence of life without the possibility of parole;

"(6) whether Defendant, by his advice and concern for others, has positively [affected] both inmates and staff with whom he has associated during his incarceration in prison;

"(7) whether Defendant has a calming and guiding effect upon younger inmates;

"(8) the Defendant's educational background and his willingness and ability to use that background for the benefit of other inmates;

"(9) whether the Defendant will contribute skilled labor which will help in the operation of the State Prison system;

"(10) the Defendant's willingness and ability to comply with the terms of a sentence of life without possibility of parole;

"(11) the Defendant's potential for [rehabilitation] and for contributing affirmatively to the lives of his friends and fellow inmates;

"(12) the likelihood that Defendant will not be a danger to others if sentenced to life in prison without the possibility of parole;

"(13) whether there are any other facts which may be considered as extenuating or reducing the Defendant's degree of moral culpability for the crimes he has committed, or which might justify a sentence of less than death even though such facts would not justify or excuse the offense."

 We repeatedly have concluded, however, that an instruction such as the one actually given in the present case, directing the jury that it may consider in mitigation "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial," adequately conveys the full

range of mitigating evidence that may be considered by the jury. (*People v. Edwards* (1991) 54 Cal.3d 787, 841-842 [1 Cal.Rptr.2d 696, 819 P.2d 436]; see also *People v. Smithey, supra,* 20 Cal.4th at p. 1007; *People v. Carpenter, supra,* 15 Cal.4th at p. 416.) In addition, we have explained that special instructions such as the one requested by defendant may be refused as argumentative and duplicative of standard instructions. (*People v. Earp* (1999) 20 Cal.4th 826, 901 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Noguera* (1992) 4 Cal.4th 599, 648 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) We reject defendant's claim that these grounds for the refusal of an instruction may not be considered unless relied upon below by the prosecution. (*People v. Braeseke* (1979) 25 Cal.3d 691, 700 [159 Cal.Rptr. 684, 602 P.2d 384]; see 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 340, pp. 382-383.)

### 3. CALJIC No. 8.88 (1989 rev.)

Defendant contends that the standard instruction on the weighing of mitigating and aggravating factors was impermissibly vague and misleading in that it failed to inform the jury that unless it found that the factors in aggravation outweighed the factors in mitigation, it could not impose a sentence of death, and in that it failed to inform the jury that if factors in mitigation outweighed those in aggravation, it must impose a sentence of life in prison without the possibility of parole. He also complains that the instruction's direction that before the jury may return a verdict of death, it must find that the aggravating circumstances are "so substantial" as to warrant a sentence of death and not life imprisonment without possibility of parole, was vague and led to arbitrary decisionmaking. He claims violation of his right to due process of law and to a reliable and nonarbitrary penalty determination under the Eighth Amendment of the United States Constitution.

We repeatedly have rejected identical claims and decline defendant's invitation to reconsider our prior rulings. (See *People v. Mendoza, supra,* 24 Cal.4th at p. 190, and cases cited; *People v. Kipp, supra,* 18 Cal.4th at p. 381, and cases cited.)

### 4. Argument of prosecutor

Defendant contends that the prosecutor, over defense objection, urged the jury to consider nonstatutory factors in aggravation, thereby taking advantage of the asserted vagueness of section 190.3.

At the commencement of his opening argument to the jury at the penalty phase of the trial, the prosecutor asked the jury to "consider Mr. Catlin's

attitude when he was committing these crimes. Mr. Catlin's total indifference to the pain and suffering these people suffered at the time that . . . he gave paraquat to Martha Catlin or with the death of Joyce and Glenna Kaye, he knew the horrible pain and suffering that the persons would go through. He also knew at the time he murdered Joyce Catlin, she was the mother of eight children and at the time he murdered Glenna Kaye, he knew that she was the mother of one child. [¶] He knew that Glenna Kaye's parents . . . would witness her horrible death in the hospital. Mr. Catlin had a total indifference of taking their lives, absolutely no respect for their lives. [¶] Mr. Catlin actually took pleasure in committing these crimes. Think of the planning and the premeditation . . . ." Later, defendant complains, the prosecutor argued "we should not kill our parents."

 Contrary to defendant's claim that these comments were not relevant to any of the factors set forth in section 190.3, comments on the culpable mental state of a defendant at the time he or she committed the charged crimes are permissible characterizations of the circumstances of those crimes under section 190.3, factor (a). (See *People v. Millwee, supra,* 18 Cal.4th at pp. 151-152; *People v. Hines* (1997) 15 Cal.4th 997, 1062 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Lucas, supra,* 12 Cal.4th at p. 495.) The prosecutor's comments were drawn from the evidence at trial regarding the circumstances of the crimes or were based upon reasonable inferences to be drawn from that evidence.

Furthermore, under authority decided after the trial in defendant's case, comments on the impact of the crime on the victim's family also are permissible under section 190.3, factor (a), as long as the comments are based on evidence that "logically shows the harm caused by the defendant." (*People v. Edwards, supra,* 54 Cal.3d at p. 835.) Contrary to defendant's claim, this authority properly is applicable retroactively to cases not yet final on appeal. (*People v. Ashmus, supra,* 54 Cal.3d at p. 991; see also *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1017 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People v. Clair, supra,* 2 Cal.4th at p. 672.) We believe that the prosecutor's allusions to the surviving children of the victims fall within the bounds of appropriate comment. Contrary to defendant's claim that the suffering of Glenna's parents was irrelevant to the charged crimes, the prosecutor's reference was permissible in that it related to the prior-murder special-circumstance finding in the present case, and the evidence of Glenna's murder also was highly relevant to the charged murders. That a prosecutor may comment on the moral opprobrium incurred by a person who kills his or her parent is too obvious to require discussion. Finally, we consistently have rejected the claim that factor (a) is too vague to satisfy constitutional requirements. (See *People v. Lucero, supra,* 23 Cal.4th at p. 728, and cases

cited; see *Tuilaepa v. California* (1994) 512 U.S. 967, 976-977 [114 S.Ct. 2630, 2637, 129 L.Ed.2d 750].)

5. *Ineffective assistance of counsel*

 Defendant contends that defense counsel provided ineffective assistance in failing to present evidence in mitigation at the penalty phase "about appellant's background, childhood or psychological profile." Defendant suggests the jury should have been informed that defendant was an adopted child who, at the age of 13 or 14 years, first was informed of his adoptive status. In support, he refers to guilt phase testimony as to which a relevance objection was sustained. He also refers to preliminary hearing testimony indicating that his mother, Martha, had punished him as a child by placing him in public view dressed in girls' clothing. Mental health professionals, defendant surmises, would have testified that such conduct caused psychological damage, and could have testified "about any other psychological problems appellant may have manifested."

We cannot determine on the basis of the record on appeal whether counsel's failure to present evidence of defendant's alleged adoptive status or childhood trauma constituted ineffective assistance. (See *People v. Diaz, supra,* 3 Cal.4th at p. 566.) As in previous cases, "[t]he appellate record does not disclose what mitigating evidence was available that was not presented, or what reasons defense counsel may have had for not presenting it." (*People v. Cudjo* (1993) 6 Cal.4th 585, 634 [25 Cal.Rptr.2d 390, 863 P.2d 635]; see also *People v. Samayoa, supra,* 15 Cal.4th at p. 857.) Although the record suggests that defendant had been adopted and that his mother had punished him as a child by dressing him in girls' clothing, the record does not disclose whether these circumstances caused defendant psychological damage. "The record does not establish defense experts would have provided exculpatory evidence if called, and we decline to speculate in that regard . . . ." (*People v. Bolin, supra,* 18 Cal.4th at p. 334.) In addition, counsel reasonably may have concluded that the evidence that was presented at the penalty phase, consisting of testimony concerning defendant's excellent adjustment to prison confinement and ability to provide assistance and comfort to persons outside of prison even during his incarceration, was likely to persuade the jury to spare his life, whereas assertions regarding his mother's conduct toward him when he was a child would not. Defendant's claims in this regard should be presented in a petition for writ of habeas corpus.[20]

---

[20]Contrary to defendant's claim, questions asked by defense counsel during voir dire, regarding prospective jurors' attitudes toward mitigating evidence related to psychological

### 6. *Automatic motion to modify verdict*

Defendant claims that in ruling on his automatic motion to modify the verdict (§ 190.4, subd. (e)), the trial court improperly considered nonstatutory factors in aggravation and failed to determine whether the weight of the evidence supported the jury's verdict.

 Section 190.4, subdivision (e), requires a court ruling upon a motion for modification to "reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict. [Citations.] The trial court must 'consider, take into account, and be guided by' the aggravating and mitigating circumstances referred to in section 190.3." (*People v. Crittenden* (1994) 9 Cal.4th 83, 150 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

In support of his claim, defendant points to the following language: "[T]he victims in this case did nothing to provoke the murders. The victims were defenseless and did not deserve to die. Mr. Catlin was in a position of trust regarding the victims, they being either his wife or his mother. Mr. Catlin had no moral justification for these murders. No one forced Mr. Catlin, no one encouraged him to commit these murders. . . . [¶] The Court is not aware of any remorse by Mr. Catlin. . . ."

The quoted statements regarding the conduct and vulnerability of the victims reflect that the court properly was engaged in considering evidence relating to section 190.3, factor (a), the circumstances of the crimes. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1220-1221 [96 Cal.Rptr.2d 1, 998 P.2d 969].) Statements regarding the absence of evidence that would tend to mitigate the defendant's moral culpability—such as coercion or remorse— also reflect that the court was considering appropriate factors. (*People v. Marshall, supra,* 13 Cal.4th at p. 865; *People v. Crittenden, supra,* 9 Cal.4th at pp. 150-151.)

Defendant contends that the court failed to engage in an independent, de novo penalty determination, and failed to reweigh the evidence of aggravating and mitigating evidence to determine whether the weight of the evidence supported the jury's verdict. As we have explained, "the trial judge's 'function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury's verdict.' "

---

trauma, do not establish that evidence of psychological trauma in fact existed that was available to counsel and that should have been presented.

(*People v. Proctor* (1992) 4 Cal.4th 499, 551 [15 Cal.Rptr.2d 340, 842 P.2d 1100], italics omitted.) Defendant's contention that the court applied the incorrect standard is refuted by the court's statement: "The Court has made its independent determination that the weight of the evidence supports the jurors' findings and verdict."

 Defendant also contends the court's ruling was undermined by its mistaken belief that the murder of Joyce was a capital offense, despite the circumstance that the murder was committed in 1976, when there was no valid death penalty statute in effect.

The record reflects that at the time sentence was imposed, the court was prepared to sentence defendant to a sentence of death for each of the two charged murders. When the prosecutor reminded the court that the murder of Joyce occurred when there was no valid death penalty statute, so that a life term was appropriate as to that count, the court concurred. We conclude that the court's misapprehension was immaterial and did not prejudice its consideration of the automatic motion for reconsideration. The circumstance that defendant had been convicted of Joyce's murder properly could be considered as a basis for imposing the death penalty for the murder of Martha, whether or not the murder of Joyce could be characterized as a separate capital offense. It is not reasonably possible that the court's misapprehension affected its decision not to modify the death penalty imposed for the murder of Martha. (See *People v. Clark* (1992) 3 Cal.4th 41, 171 [10 Cal.Rptr.2d 554, 833 P.2d 561].) Defendant fails to provide any support for his related but pro forma contention that the court's mistake "infected not only the court's obligation under Penal Code section 190.4, but his entire handling of the case."

7. *Constitutionality of the California death penalty statute, and other related contentions*

Defendant contends the California death penalty statute is constitutionally deficient in various respects. His claims of violations of the federal Constitution have been rejected in prior decisions, and no basis for reconsideration appears. The trial court need not instruct the jury as to which factors under section 190.3 are aggravating and which are mitigating. (*People v. Bradford, supra*, 15 Cal.4th at p. 1383.) The jury is not required to make written findings. (*People v. Riel, supra*, 22 Cal.4th at p. 1225.) "The jury need not find beyond a reasonable doubt that aggravating factors exist [except for other-crimes evidence], that they outweigh mitigating factors, or that death is the appropriate penalty." (*Ibid.*) Intercase proportionality review is not required (*People v. Carpenter, supra*, 15 Cal.4th at p. 420),

and to the extent that defendant claims in this connection that the death penalty is disproportionate to his own culpability, the claim is rejected. ▮ " 'To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation] or, stated another way, that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity" ' " [citation] the court must invalidate the sentence as unconstitutional.' " (*People v. Riel, supra,* 22 Cal.4th at pp. 1223-1224.) In light of the circumstances of the present crimes, for which this mature defendant was solely responsible, defendant's repeated offenses over a period of time, and the dire consequences of his acts, we do not believe that the punishment imposed is grossly disproportionate, even taking into account the mitigating evidence regarding his character, past acts of kindness, and successful adjustment in prison.

Defendant's vagueness challenge to section 190.3 has been rejected. (*People v. Jenkins, supra,* 22 Cal.4th at pp. 1050-1053; *People v. Arias* (1996) 13 Cal.4th 92, 187-188 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Sanchez, supra,* 12 Cal.4th at p. 81; see also *People v. Lucero, supra,* 23 Cal.4th at p. 737.) The claim that the jury was instructed in vague terms that erroneously would permit it to consider the murder of Joyce and the murder of Glenna as circumstances in aggravation is rejected; such consideration was appropriate. (See § 190.3, factors (a), (b).) Defendant's claim that the trial court's original belief that the murder of Joyce could be punished by a separate death sentence—a belief expressed outside the presence of the jury—might have affected the jury's consideration of factor (a) is rejected as based only upon speculation. Defendant's contention that this state's death penalty statute fails adequately to narrow the class of persons subject to the death penalty already has been rejected above. (See also *People v. Jenkins, supra,* 22 Cal.4th at p. 1050.) We also have rejected his claim that the death penalty law violates the Eighth Amendment by vesting unlimited discretion in prosecutors to determine whether to seek the death penalty. (*People v. Kraft, supra,* 23 Cal.4th at p. 1078; *People v. Arias, supra,* 13 Cal.4th at p. 189.) We reject as unsupported by relevant authority defendant's claim that, because this is a capital case, any failure of defense counsel to object to asserted errors at trial cannot be deemed a waiver or forfeiture of such claims.

### 8. *Cumulative prejudice*

Any errors we have identified, whether considered singly or together, are nonprejudicial and do not undermine the reliability of the death judgment under the Eighth and Fourteenth Amendments or create a risk that the sentence erroneously was imposed.

## III. DISPOSITION

The judgment of death is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied September 26, 2001, and the opinion was modified to read as printed above.